THE STATE OF OHIO, APPELLANT, *v.* WHITE, APPELLEE.

[Cite as *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492.]

(No. 2013–0109—Submitted February 5, 2014—Decided February 18, 2015.)

---

O'DONNELL, J.

{¶ 1} The state of Ohio appeals from a judgment of the Sixth District Court of Appeals reversing the conviction of Thomas Caine White—a former Ottawa Hills police officer—for felonious assault with a firearm specification arising from his shooting of Michael McCloskey Jr. during a traffic stop. The appellate court held the firearm specification unconstitutional as applied to White and concluded that the trial court committed reversible error by improperly instructing the jury on the use of deadly force, by failing to give a mistaken-belief instruction, and by excluding testimony about the crimes that White believed McCloskey had committed.

{¶ 2} Because the firearm specification does not apply in this case, because the jury instructions misled the jury, and because the trial court erroneously excluded relevant evidence regarding the offenses that White believed McCloskey had committed, we affirm the judgment of the court of appeals and remand the matter for further proceedings consistent with this opinion.

## Facts and Procedural History

{¶ 3} On the evening of May 22, 2009, McCloskey and Aaron Snyder rode their motorcycles to distribute business cards promoting Snyder's business and flyers advertising "Bike Nights" at the Omni, a concert and club destination located on West Bancroft Street in Toledo where McCloskey worked. Around 1:00 a.m. on the morning of May 23, 2009, they went to the Omni and met Klint Sharpe, and the three men decided to go to McCloskey's home in Ottawa Hills. McCloskey and Snyder rode their motorcycles and Sharpe followed in his car.

{¶ 4} At the intersection of Secor and Indian Roads, Sharpe took a different route, and White, who was on patrol in Ottawa Hills in a marked police cruiser, began to follow McCloskey and Snyder, who mistook the cruiser's headlights as belonging to Sharpe's car as they continued on Indian Road. White observed them weaving from side to side and activated his cruiser's dashboard video camera to document their driving. He saw McCloskey cross the center yellow lines multiple times, make incomplete stops at stop signs, weave within the lane, and exceed the speed limit.

{¶ 5} White radioed another patrol officer, Christopher Sargent, who was on duty that night, and told him that he "wanted to stop a couple of motorcycles" and thought they "were messing with him." White continued trailing McCloskey and Snyder as he waited for Sargent to arrive.

{¶ 6} McCloskey and Snyder stopped for about ten seconds at an intersection, and White believed they talked and looked back at him before abruptly speeding away toward Central Avenue. Thinking that the motorcyclists were fleeing, he activated his cruiser's siren and lights and radioed the dispatcher that he was in pursuit.

{¶ 7} Sargent then arrived from Central Avenue with his cruiser's lights and siren activated, and at that point Snyder drove over a grassy island before his motorcycle came to a stop on the street. Sargent got out of his cruiser, drew his weapon, and took Snyder into custody.

{¶ 8} At the same time, McCloskey stopped his motorcycle, and White exited his cruiser, drew his service weapon, and yelled to McCloskey to put his hands up. McCloskey remained seated on his motorcycle with the motor running, and White later testified that he had seen him turn with his "right arm and elbow * * * making a drawing motion to the right," causing him to believe that McCloskey "was pulling a weapon." At that point, White fired one shot that struck McCloskey in the back, paralyzing him and causing the motorcycle to fall on his leg. White approached and searched McCloskey's pockets and waist area but found no weapon. Another Ottawa Hills police officer subsequently found a sheathed knife clipped to McCloskey's right boot.

{¶ 9} A Lucas County Grand Jury indicted White on one count of felonious assault in violation of R.C. 2903.11(A)(2) with a firearm specification pursuant to R.C. 2941.145. The matter proceeded to a jury trial, and at the close of the state's case-in-chief, White moved for acquittal and also argued that the firearm specification should not apply to him. The trial court denied the motion, determining that the state had presented sufficient evidence to prove both the crime of felonious assault and the firearm specification.

{¶ 10} White testified in his defense, but the trial court sustained the state's objection and prevented him from testifying about offenses he believed McCloskey had committed. The defense also presented expert testimony that McCloskey's actions would have led a reasonable police officer to perceive a threat of physical harm, because McCloskey had appeared to flee from police, had not raised his hands as instructed, and had made suspicious movements consistent with visually targeting the officer and reaching as if to pull a weapon from his waistband.

{¶ 11} After deliberations, the jury returned verdicts finding White guilty of felonious assault and the accompanying firearm specification. The court imposed a seven-year prison term for the felonious assault conviction and ordered that it be served consecutively to a mandatory three-year term for the firearm specification.

{¶ 12} White appealed, and the court of appeals reversed the felonious assault conviction and remanded the matter for a new trial. It further held that the firearm specification was unconstitutional as applied to White and ordered it dismissed with prejudice. 2013-Ohio-51, 988 N.E.2d 595, ¶ 171, 176 (6th Dist.). In reversing the felonious assault conviction, the appellate court determined that the trial court erred by charging the jury on the standard for using nondeadly

force in a deadly force case and by failing to instruct the jury using the deadly force standard set forth in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). *White* at ¶ 105, 109. It also concluded that the trial court erred by failing to give a mistaken-belief instruction, *id.* at ¶ 116, 123, and by prohibiting White from testifying about the crimes that he believed McCloskey had committed, *id.* at ¶ 126–127. It rejected White's arguments that insufficient evidence supported the felonious assault conviction, *id.* at ¶ 92, and that an instruction on the lesser included offense of negligent assault should have been given, *id.* at ¶ 139, and it declined to rule on his other assignments of error, finding them to be moot, *id.* at ¶ 174.

{¶ 13} The state appealed and presented five propositions of law, which we accepted for review. 135 Ohio St.3d 1447, 2013-Ohio-2062, 987 N.E.2d 703.

### Use of Deadly Force by Police

{¶ 14} At common law, a law enforcement officer had a privilege to use force in the discharge of his official duties. *Swedlund v. Foster*, 2003 SD 8, 657 N.W.2d 39, ¶ 40; 2 Torcia, *Wharton's Criminal Law*, Section 124, at 156, and Section 185, at 429 (15th Ed.1994); 2 LaFave, *Substantive Criminal Law*, Section 10.7 (2d Ed.2003). As the Supreme Court of Iowa explained in *State v. Smith*, 127 Iowa 534, 103 N.W. 944 (1905):

> An officer, in the performance of his duty as such, stands on an entirely different footing from an individual. He is a minister of justice, and entitled to the peculiar protection of the law. Without submission to his authority there is no security, and anarchy reigns supreme. He must, of necessity, be the aggressor, and the law affords him special protection.

*Id.* at 537–538. *See also Stinnett v. Virginia*, 55 F.2d 644, 647 (4th Cir.1932) ("When the state sends an officer forth to arrest a felon, she says to him to make the arrest peaceably if he can, forcibly if he must. If in making the arrest he uses force, he should not be treated as a criminal, if he uses only such force as is reasonably necessary under the circumstances").

{¶ 15} In making arrests for felonies and misdemeanors, an officer could use whatever force was reasonably necessary—including deadly force—if the suspect offered resistance; and in the case of a fleeing felon, deadly force could be used even if the offender presented no imminent threat of harm. 2 Torcia, *Wharton's Criminal Law*, Section 124, at 156; 2 LaFave, *Substantive Criminal Law*, Section 10.7, at 173–178; *Schumann v. McGinn*, 307 Minn. 446, 458, 240 N.W.2d 525 (1976).

{¶ 16} In those circumstances, the officer did not face criminal liability; injuring the offender did not constitute an assault, and a killing was not murder. *See Tennessee v. Garner*, 471 U.S. at 12, 105 S.Ct. 1694, 85 L.Ed.2d 1, quoting 2 Hale, *Historia Placitorum Coronae* 85 (1736) (if officers pursue suspected felons who " 'resist or fly, so that they cannot be otherwise apprehended, and are upon necessity slain therein, * * * it is no felony' "); *Lynn v. People*, 170 Ill. 527, 537, 48 N.E. 964 (1897) (explaining that when an officer kills a resisting suspect, the killing is justified); *Jett v. State*, 151 Ark. 439, 236 S.W. 621, 624 (1922) (if an officer making an authorized arrest "kills the person he thus seeks to arrest, he is blameless, for he did no more than his duty required him to do"); 2 Torcia, *Wharton's Criminal Law*, Section 124, at 165–166 ("With respect to a felony or misdemeanor, * * * if the resistance escalates to such a degree as to threaten his life, [an officer] may resort to deadly force"); Simon, *Tennessee v. Garner: The Fleeing Felon Rule*, 30 St. Louis U. L.J. 1259, 1263–1264 (1986) ("If the suspected felon was killed by his pursuers during the apprehension process, his death was considered justified").

{¶ 17} Ohio courts also recognized that a police officer is justified at common law to use reasonable force in the course and scope of his law enforcement duties. As the Second District Court of Appeals explained in *State v. Sells*, 30 Ohio Law Abs. 355, 1939 WL 3272 (2d Dist.1939), a case involving the prosecution and conviction of two police officers for assault and battery:

> "A peace officer duly empowered is not liable for injuries inflicted by him in the use of reasonably necessary force to preserve the peace and maintain order, or to overcome resistance to his authority. Thus an officer making an arrest is justified in using sufficient force to subdue the prisoner although not acting in self defense. However, if unnecessary violence is used by the officer in accomplishing his purpose, * * * or if he assaults the person whom he is arresting without just cause or excuse, especially after resistance to his authority ceases, * * * he loses the protection of the law."

*Id.* at 357–358, quoting with approval 6 Corpus Juris Secundum, Assault and Battery, Section 23, at 825 (1937); *see also Skinner v. Brooks*, 74 Ohio App. 288, 291, 58 N.E.2d 697 (1st Dist.1944), quoting 3 Ohio Jurisprudence, Arrest, Section 36, at 171 (1928) (" 'The law not only clothes an officer under duty to make an arrest with power to accomplish his purpose, but it also protects him while in the exercise of his authority' ").

{¶ 18} As legislatures expanded the crimes classified as felonies beyond those established at common law, however, some courts questioned the use of deadly

force to apprehend fleeing felons who posed no danger to the public. *See generally Jones v. Marshall,* 528 F.2d 132, 138–139 (2d Cir.1975); *Mattis v. Schnarr,* 547 F.2d 1007, 1019–1020 (8th Cir.1976) (en banc), *vacated sub nom. Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977); Simon, 30 St. Louis U. L.J. at 1265.

{¶ 19} In *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1, the court reviewed the constitutionality of a Tennessee statute that codified the common law rule permitting police officers to use deadly force to prevent the escape of a suspected felon. In that case, Memphis police officers responding to a report of a burglary observed Edward Garner fleeing from the scene, and they found him crouching at the base of a fence, apparently unarmed. One of the officers commanded Garner to halt, but when Garner tried to climb the fence, the officer fatally shot him in the back of the head. *Id.* at 3–4. Garner's father filed an action in federal court seeking damages pursuant to 42 U.S.C. 1983 for the violation of his son's constitutional rights. The district court entered judgment for all defendants, finding that the statute and the officer's actions were constitutional, but the Sixth Circuit Court of Appeals reversed, concluding that shooting a fleeing felon is unreasonable when there is no probable cause to believe the suspect posed a threat to safety. *Id.* at 5–6.

{¶ 20} The Supreme Court affirmed, holding that apprehension by use of deadly force is a "seizure" subject to the reasonableness requirement of the Fourth Amendment, and it determined that the use of deadly force to prevent the escape of all felony suspects is constitutionally unreasonable. *Id.* at 7, 11. Thus, the court rejected the common-law "fleeing felon" rule, which had allowed the use of whatever force was necessary to effect the arrest of a fleeing felon, and it decided that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead. The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects." *Id.* at 11.

{¶ 21} The court concluded that the Fourth Amendment imposes greater protections than the common law rule, but it did not hold that the Tennessee statute was unconstitutional on its face or preclude the use of deadly force in all circumstances. *Id.* Rather, the court explained that a police officer may use deadly force "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* The court gave two examples of the constitutional use of deadly force: "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of

serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12.

{¶ 22} The court revisited *Garner* in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), a case that involved the use of excessive, nondeadly force by police officers during the course of an investigatory stop, and it held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." (Emphasis sic.) *Id.* at 395.

{¶ 23} The court further clarified:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. * * * The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–397. The reasonableness of an officer's use of force, the court explained, "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. *See also Scott v. Harris*, 550 U.S. 372, 386, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death"); *Plumhoff v. Rickard,* —— U.S. ——, 134 S.Ct. 2012, 2022, 188 L.Ed.2d 1056 (2014) ("Rickard's flight posed a grave public safety risk, and here, as in *Scott*, the police acted reasonably in using deadly force to end that risk").

{¶ 24} Although the Supreme Court's decisions in *Garner* and *Graham* involved an officer's civil liability for deprivation of civil rights under color of law, these cases nonetheless help to define the circumstances in which the Fourth Amendment permits a police officer to use deadly and nondeadly force.

{¶ 25} Courts therefore apply *Garner* and *Graham* in reviewing criminal convictions arising from a police officer's use of deadly force. *See, e.g., United States v. Ramos*, 537 F.3d 439, 457 (5th Cir.2008) ("there is no question but that a police officer's unjustifiable shooting of a victim qualifies as a crime of violence;

there is no question but that a police officer's shooting a victim who poses no physical threat to the safety of the officer or the public is unjustifiable"); *State v. Pagotto*, 361 Md. 528, 555, 762 A.2d 97 (2000) (prosecution of police officer for involuntary manslaughter and reckless endangerment); *State v. Smith*, 73 Conn. App. 173, 198, 807 A.2d 500 (2002) (prosecution of police officer for first-degree manslaughter); *State v. Mantelli*, 131 N.M. 692, 2002–NMCA–033, 42 P.3d 272, ¶ 31 (prosecution of police officer for voluntary manslaughter, aggravated assault with a deadly weapon, and shooting at a motor vehicle resulting in injury); *People v. Martin*, 168 Cal.App.3d 1111, 1124, 214 Cal.Rptr. 873 (1985) (noting that *Garner* "limits the scope of justification for homicide").

### The Firearm Specification

{¶ 26} The state maintains that principles of due process are not violated by applying the firearm specification contained in R.C. 2941.145 to a law enforcement officer indicted for an on-duty shooting. It notes that the General Assembly has provided no exception for police officers, and it also argues that imposing a firearm specification for an unjustified shooting neither infringes on any fundamental right nor shocks the conscience. According to the state, the legislature had a rational basis to deter all offenders from using firearms to commit crimes, regardless of whether the crime is committed by a member of the "criminal world" or an on-duty police officer. It urges that even if White's duties as a peace officer required him to carry a firearm, those duties did not require him to discharge it, so that when he committed a crime by firing it at McCloskey, it was not a legitimate act of law enforcement or within the course and scope of his official duties. The state cites decisions from other jurisdictions rejecting due process claims brought by on duty police officers whose sentences were enhanced based on the use of a firearm while committing an offense, and it asserts that the only question is whether the legislature intended the enhancement to apply to police officers. It also maintains that because there have been no prior decisions holding the firearm specification unconstitutional, the trial court did not commit plain error by applying it here.

{¶ 27} White initially asserts that the firearm specification contained in R.C. 2941.145 violates due process and is unconstitutional *as applied* to an on duty police officer charged in connection with a police shooting, because the General Assembly enacted R.C. 2941.145 to punish the voluntary decision of a criminal to use a gun while committing a crime. He also states that he lacked criminal intent, and because he was required to possess a service weapon as a law enforcement officer, he should face criminal liability only if he discharged his firearm while acting outside the course and scope of his law enforcement duties. White contends that there is no rational basis for imposing a firearm specification on an officer who possesses, brandishes, or discharges his firearm while on duty,

because the legislative intent of punishing criminals for possessing firearms inherently conflicts with the jurisprudence that defines when a police officer is culpable for a police shooting.

{¶ 28} Although the parties dispute whether the firearm specification contained in R.C. 2941.145 is constitutional as applied to White, we have consistently recognized that " 'when a case can be decided on other than a constitutional basis, we are bound to do so.' " *State v. Swidas*, 133 Ohio St.3d 460, 2012-Ohio-4638, 979 N.E.2d 254, ¶ 14, quoting *State ex rel. Crabtree v. Ohio Bur. of Workers' Comp.*, 71 Ohio St.3d 504, 507, 644 N.E.2d 361 (1994). *Accord State v. Bloomer*, 122 Ohio St.3d 200, 2009-Ohio-2462, 909 N.E.2d 1254, ¶ 67 (recognizing that courts should decide constitutional questions only when necessary). And here, the question whether R.C. 2941.145 applies to White's conduct in these circumstances may be decided on narrower grounds of statutory interpretation.

{¶ 29} As we explained in *State v. Taylor*, 138 Ohio St.3d 194, 2014-Ohio-460, 5 N.E.3d 612, ¶ 14, "Our role, in the exercise of the judicial power granted to us by the Constitution, is to interpret the law that the General Assembly enacts, and the primary goal in construing a statute is to ascertain and give effect to the intent of the legislature." R.C. 1.47(C) establishes a presumption that in enacting a statute, "[a] just and reasonable result is intended." We have therefore recognized that "statutes will be construed to avoid unreasonable or absurd consequences." *State v. Wells*, 91 Ohio St.3d 32, 34, 740 N.E.2d 1097 (2001).

{¶ 30} R.C. 2941.145(A) imposes a mandatory three-year prison term for offenses committed when "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it *to facilitate the offense.*" (Emphasis added.)

{¶ 31} The purpose of a firearm specification is to enhance the punishment of criminals who voluntarily introduce a firearm while committing an offense and to deter criminals from using firearms. In enacting firearm specifications, the General Assembly recognized that "a criminal with a gun is both more dangerous and harder to apprehend than one without a gun." *State v. Powell*, 59 Ohio St.3d 62, 63, 571 N.E.2d 125 (1991). But in contrast to those who freely choose to use a firearm while committing a crime, a firearm specification is not intended to deter a peace officer from possessing a firearm, because the officer is *required* to carry a firearm and permitted to use it, when necessary, in the course of carrying out the duties of a law enforcement officer.

{¶ 32} R.C. 2935.03(A)(1) mandates that peace officers "shall arrest and detain, until a warrant can be obtained, a person found violating, within the limits of the political subdivision * * * a law of this state" or a municipal ordinance. Further, R.C. 2921.44(A)(2) makes it a second-degree misdemeanor for a law enforcement

officer to negligently fail to prevent or stop the commission of an offense or to negligently fail to apprehend an offender. The mandatory duty to enforce criminal laws and apprehend violators necessarily places police officers in dangerous situations where the use of force is expected and often required; for this reason, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865, 104 L.Ed.2d 443.

{¶ 33} The safety of the officer and the public depends on the officer's ability to gauge the dangerousness of a suspect and react immediately according to training and experience. Yet as the court explained in *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), "the police on an occasion calling for fast action have obligations that tend to tug against each other. * * * They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* at 853, quoting *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Given the need for hurried judgments without the chance for reflection, and given the extensive training that causes officers to act reflexively when encountering potentially dangerous situations, it is neither just nor reasonable to apply a firearm specification to a police officer involved in an on-duty shooting based only on a showing of poor judgment or negligence in using force.

{¶ 34} We therefore conclude that the General Assembly did not intend the firearm specification to apply to a police officer who fired a gun issued to him to protect himself, fellow officers, and the public from a person he thought was about to brandish a weapon. In those circumstances, it cannot be said that the officer used the firearm in an attempt to "facilitate" an offense. Rather, the statute requires that a distinction be drawn between a police officer who acts in accord with the duty to uphold the law and one who abandons that duty by committing a criminal offense.

{¶ 35} The firearm specification may apply if the facts of a given case demonstrate that the actions of the officer display criminal misconduct constituting a departure from the course and scope of official duties, as police officers have no license to commit crimes under color of office. *See, e.g., United States v. Ramos*, 537 F.3d at 458 (upholding application of a firearm specification to border patrol officers convicted of criminal offenses for shooting a fleeing suspect when there was no physical threat to the officers or to others); *United States v. Moore*, 363 F.3d 631, 641 (7th Cir.2004) (upholding application of a firearm specification to police officers "hired to use their status as police officers, with all the trappings, to protect Silky's drug couriers," even though the officers' service weapons had not been brandished or used); *United States v. Contreras*, 950 F.2d

232, 241–242 (5th Cir.1991) (upholding application of a firearm specification to a police officer who conducted a traffic stop and then sexually assaulted a passenger in the vehicle).

{¶ 36} Police officers who abandon their employment and depart from the course and scope of their law enforcement duties or deviate from departmental policy by engaging in criminal activity, as for example, by robbing a drug dealer at gunpoint, would subject themselves to a firearm specification because they have voluntarily chosen to engage in criminal activity. In those kinds of circumstances, a police officer stands on equal footing with other members of the public who commit crime while displaying, brandishing, possessing, or using a firearm.

{¶ 37} In contrast, a police officer who does not abandon employment or act outside the course and scope of official duties or contravene departmental policy by engaging in criminal activity, but who misperceives a threat of harm, displays, brandishes, possesses, or uses a firearm while engaging in legitimate law enforcement duties does not become subject to the firearm specification; the officer's actions in such a situation involve a judgment determination regarding the use of the firearm.

{¶ 38} It is not apparent in this case that White abandoned his employment or acted outside the course and scope of his official duties or against departmental policy or protocol. The village of Ottawa Hills authorized and required White to carry a firearm in pursuit of his duties as a peace officer, and it expected him to exercise his judgment in deciding whether to use a weapon based on his training and experience. The only question presented by this record concerns the reasonableness of the force he used, not whether White acted within the course and scope of his duties as an officer of the village of Ottawa Hills at the time that he pursued and stopped McCloskey and discharged his weapon.

{¶ 39} The General Assembly did not intend a firearm specification to be applied to a police officer in these circumstances, and therefore this proposition of law is not well taken.

## Pretrial Dismissal Based on Civil Immunity

{¶ 40} Next, the state urges that Ohio does not permit pretrial dismissals of criminal charges based on civil immunity principles, nor does an officer's qualified immunity for civil liability imposed by 42 U.S.C. 1983 preclude criminal prosecution for state law offenses. In response, White points out that because the appellate court did not hold that an officer's qualified immunity allows the pretrial dismissal of criminal charges, the state seeks an advisory opinion.

{¶ 41} In its opinion, the appellate court observed that "immunities of the kind resembling qualified immunity might also protect police officers from criminal

prosecution for using deadly force." 2013-Ohio-51, 988 N.E.2d 595, at ¶ 85. Nonetheless, it concluded that White had forfeited any claim of immunity from criminal liability based on his failure to raise it in the trial court, and the appellate court chose not to reach the merits of the issue. *Id.* at ¶ 87. The state concedes that most of the appellate court's discussion is dicta, and White, the only party aggrieved by the court of appeals' decision in this regard, has not cross-appealed. Therefore, the state's second proposition is not properly before us, and we decline to address it.

### Jury Instructions on Use of Force

{¶ 42} The third proposition of law states:

> In a trial of a police officer charged with felonious assault for an on-duty shooting, the court commits neither an abuse of discretion nor plain error if it instructs the jury to determine, from the perspective of a reasonable police officer, whether the officer's use of deadly force was objectively reasonable, or whether the officer had reasonable grounds to believe that he or a fellow officer was in imminent danger of death or great bodily harm.

{¶ 43} At trial, the court charged the jury:

> Now, as to the affirmative defense of justification. The defendant has asserted the affirmative defense that he was justified in his use of force in the exercise of his official duties as a police officer. The burden of going forward with the evidence of the affirmative defense and the burden of proving that offense [sic] are upon the defendant.
>
> In order to establish this defense, the defendant must prove by a preponderance of the evidence that he was acting in pursuit of his official duties and that his *use of deadly force was objectively reasonable under the circumstances.*
>
> * * *
>
> Now, excessive force. If the defendant used more force than reasonably necessary in pursuing his official duties, the defense of justification is not available.
>
> Test for reasonableness of force. In deciding whether the defendant had reasonable grounds to believe Officer Sargent or himself was in imminent danger of death or great bodily harm, you must put yourself in the position of the defendant, with his characteristics and his knowledge,

and under the circumstances and conditions that surrounded him at the time.

You must consider the conduct of Michael McCloskey and decide whether his acts caused the defendant reasonably and honestly to believe that Officer Sargent or himself was about to be killed or receive great bodily harm.

Reasonableness must be judged from the perspective of a reasonable police officer in light of all the facts and circumstances confronting the officer at the time and in the moments before the use of deadly force rather than with 20/20 vision of hindsight.

What constitutes reasonable action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure. Allowance must be made for the fact that officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving.

In determining whether the defendant acted reasonably in his use of force in the pursuit of his official duties, you must consider factors such as the severity of the crime Mr. McCloskey was believed to have committed, whether Mr. McCloskey posed an immediate threat to the safety of defendant or another person, and whether Mr. McCloskey was actively resisting arrest or attempting to evade arrest by flight.

(Emphasis added.)

{¶ 44} The state urges us to reject the appellate court's determination that these instructions misled the jury by failing to provide a charge from *Tennessee v. Garner*, 471 U.S. at 11, 105 S.Ct. 1694, 85 L.Ed.2d 1, that would have stated that an officer is justified in using deadly force when there is "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," and it asserts that all claims of excessive force should be analyzed in terms of objective reasonableness. Further, it maintains that White was not prejudiced by the lack of such an instruction, because at most the jury could have been misled into finding that White was justified in using deadly force, which could only have benefited him. And it claims that White invited the error by requesting an instruction regarding the objective reasonableness of his use of force.

{¶ 45} White maintains that the trial court's instructions were imprecise and misleading because the central question at trial was whether, in the moments before he fired, he could have reasonably perceived an imminent threat to his or his fellow officer's safety based on McCloskey's actions. But because the jury was not asked to consider the reasonableness of White's perception of a threat, he

contends, it could not gauge the reasonableness of his use of deadly force. White disputes any claim of invited error, asserting that he objected to the excessive-force instruction and pointing out that the "inadequate statement of law to the jury * * * came mostly from the State's proposal."

{¶ 46} A trial court has broad discretion to decide how to fashion jury instructions, but it must "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. We require a jury instruction to present a correct, pertinent statement of the law that is appropriate to the facts. *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5; *State v. Lessin*, 67 Ohio St.3d 487, 493, 620 N.E.2d 72 (1993). But there is a limit, and "[n]o purpose is served, for instance, by requiring courts to present redundant jury instructions or instructions that are so similar to other instructions to be presented as to be confusing." *Griffin* at ¶ 5.

{¶ 47} Here, it is not disputed that White used deadly force in the line of duty, and therefore the jury charge should have been tailored to instruct the jury on when a police officer is justified in using deadly force.

{¶ 48} Because a police officer's justification to use deadly force is limited by the Fourth Amendment, the appropriate instruction on deadly force is taken from *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1. *Garner* establishes that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others," the officer does not act unreasonably by using deadly force. *Id.* at 11.

{¶ 49} The trial court did not include this statement in its instructions or otherwise provide a correct and concise statement regarding when deadly force is justified pursuant to *Garner*. Rather, the court informed the jury that White could establish an affirmative defense if "his use of deadly force was objectively reasonable under the circumstances." But the test for deadly force is not so imprecise. *Garner* defines the very circumstances to be considered in a deadly force case such as this; that is, when there is probable cause for a police officer to believe that the suspect poses a threat of serious physical harm to the officer or others. The description of "objectively reasonable under the circumstances" here is vague to the point of misdirection.

{¶ 50} The court followed this with extraneous instructions on "excessive force," explaining that White could not avail himself of the affirmative defense if he used "more force than reasonably necessary." It then told the jury to use an objective standard to consider whether White believed that he or his fellow officer "was in imminent danger ·of death or great bodily harm" and to consider

McCloskey's conduct in deciding whether his acts caused White to "reasonably and honestly believe" that he or his fellow officer "was about to be killed or receive great bodily harm." But *Garner* requires that the officer have "probable cause to believe that the suspect poses a threat of serious physical harm" to the officer or others, *id.* at 11; it does not require "imminent danger of death" or a belief that the officer or another person was "about to be killed" in order to allow the use of deadly force.

{¶ 51} The trial court appears to have based most of its instructions on the reasonableness analysis set forth in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443. But although *Graham* may provide guidance on the factors a jury should consider to determine reasonableness from the perspective of an objectively reasonable officer, the consideration of these additional factors does not supplant the required analysis in a deadly force case. And importantly, not every statement of law related to reasonableness is an appropriate instruction in every deadly or excessive-force case.

{¶ 52} The relevant principle for jury instructions is not one of abstract correctness, but is whether an instruction—even if a correct statement of law—is potentially misleading. *See State v. Guster*, 66 Ohio St.2d 266, 271, 421 N.E.2d 157 (1981) ("Abstract rules of law or general propositions, ·even though correct, ought not to be given unless specifically applicable to facts in issue").

{¶ 53} The jury instructions in this case are potentially misleading, because without a proper instruction on the use of deadly force and justification, the court failed to give the jury the instructions necessary to weigh the evidence and discharge its duty as fact-finder. *See Rasanen v. Doe*, 723 F.3d 325, 337 (2d Cir.2013) (holding that the trial court erred in failing to instruct the jury that deadly force is justifiable when an officer reasonably believes the suspect poses a significant threat of death or serious physical injury); *Rahn v. Hawkins*, 464 F.3d 813, 818 (8th Cir.2006) ("The sole issue at trial was whether the defendants' use of force was justified. A correct statement of the law as to what circumstances justified deadly force was therefore critical to a correct disposition of the case"); *Haislah v. Walton*, 676 F.2d 208, 213 (6th Cir.1982) (holding jury charge improper because it "repeatedly referr[ed] to force 'necessary under the circumstances' without saying what the force was necessary for").

{¶ 54} One of the dissents characterizes the Supreme Court's opinion in *Graham* as somehow modifying the deadly force standard announced in *Garner*. In *Graham*, the court reviewed a line of authority that had held that a claim of nondeadly excessive force is governed by principles of substantive due process or the Eighth Amendment and that had applied a standard questioning whether the force was applied in "good faith" or "maliciously and sadistically for the very purpose of causing harm." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865, 104 L.Ed.2d

443. *Graham* explains that all claims of excessive force—deadly and nondeadly— brought in a Section 1983 action for deprivation of constitutional rights must be analyzed in terms of the explicit textual source of the constitutional right and that the textual source of the right to be free from an unreasonable seizure is the Fourth Amendment, not the Due Process Clause. *Id.* at 395. Nothing in *Graham* modified the principle of law that *Garner* had articulated: a police officer acts reasonably in using deadly force when the officer has a reasonable belief that the suspect poses a threat of serious physical harm or death to the officer or to others. *See Plumhoff,* —— U.S. ——, 134 S.Ct. at 2022, 188 L.Ed.2d 1056 (concluding that police acted reasonably in using deadly force to end "a grave public safety risk").

{¶ 55} The appellate court properly determined that the trial court's instruction on deadly force potentially misled the jury and constituted reversible error. We concur with its analysis and conclusion and therefore reject the state's third proposition of law.

### Mistaken–Belief Jury Instruction

{¶ 56} In its fourth proposition of law, the state maintains that the trial court did not commit plain error when it failed to provide a mistaken-belief instruction. It notes that White never requested a mistaken-belief or mistake-of-fact instruction and argues that even if he had, this court in *State v. Wenger,* 58 Ohio St.2d 336, 339, 390 N.E.2d 801 (1979), fn. 3, rejected the notion that a mistaken belief precludes a finding that the accused committed an offense knowingly. It also contends that a mistaken-belief instruction would have been superfluous because the trial court's instruction on the meaning of the mens rea "knowingly" necessarily incorporated a defense of mistake of fact and allowed the jury to determine whether White knew that his conduct would harm another. White maintains that the jury should have been instructed that his belief that McCloskey was drawing a firearm could be mistaken yet nonetheless reasonable, so that an officer's objectively reasonable perceptions that a suspect is drawing a weapon justifies the use of force even if the suspect turns out to have been unarmed.

{¶ 57} White did not specifically request an instruction that it could have been objectively reasonable for him to form the mistaken belief that McCloskey had a weapon, and therefore he has forfeited all but plain error. *State v. Davis,* 127 Ohio St.3d 268, 2010-Ohio-5706, 939 N.E.2d 147, ¶ 24. Plain error does not exist unless it can be said that but for the error, the outcome of the trial would have been different and that reversal is necessary to prevent a manifest miscarriage of justice. *Id.* at ¶ 29.

{¶ 58} The court of appeals concluded that the failure to give a mistaken-belief instruction constituted plain error. It explained: "That the 'knowingly' element of felonious assault can be negated by a *factually-mistaken* belief is clearly

established in Ohio's mistake-of-fact defense. This defense, if accepted by the jury, renders the state's case insufficient on that element, entitling the defendant to an acquittal." (Emphasis sic.) 2013-Ohio-51, 988 N.E.2d 595, at ¶ 120.

{¶ 59} Contrary to the appellate court's conclusion, the knowledge element of felonious assault was not at issue in this trial because White never disputed that he knowingly fired his service weapon at McCloskey. *See State v. Guster*, 66 Ohio St.2d at 271, 421 N.E.2d 157 ("it is clear that a court's instructions to the jury should be addressed to the actual issues in the case"); *Wenger*, 58 Ohio St.2d at 339, 390 N.E.2d 801, fn. 3 (a mistake of fact does not negate the accused's mental state when "[t]here is no question that the defendant intended to strike Officer Whalen in the back with the stick, and his motive or purpose for intervening has no bearing on the requirements for a conviction of assault").

{¶ 60} Rather, a mistake-of-fact instruction could only relate to White's affirmative defense of justification in using deadly force. As the court indicated in *Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled in part on other grounds, Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009): "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed."

{¶ 61} Here, the trial court informed the jury that a mistaken belief by White that McCloskey had a firearm could be reasonable. It specifically directed the jury to consider only the facts known to White before the use of force and instructed it to judge his actions from the perspective of a reasonable officer in light of the facts and circumstances known to him and without the jury's benefit of the "20/20 vision of hindsight." The court informed the jury that "[w]hat constitutes reasonable action may seem quite different to someone facing a possible assailant" and that "[a]llowance must be made for the fact that officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving."

{¶ 62} The trial court's failure to provide an instruction that a mistaken belief could negate the knowledge element of felonious assault in this case does not rise to plain error because White has failed to demonstrate its effect on the outcome of the trial or that reversal is necessary to prevent a manifest miscarriage of justice. To that extent only, the state's fourth proposition of law is well taken.

### Exclusion of Testimony

{¶ 63} The state asserts that in the trial of a police officer charged with felonious assault for an on-duty shooting, a court does not abuse its discretion in excluding testimony regarding the specific violations and the degree of any offense that the officer believed the suspect may have committed. The state

contends that allowing White to testify about the violations that he believed McCloskey had committed would have been more prejudicial than probative and would have allowed him to exaggerate his perception of risk. It further argues that there is no evidence indicating that McCloskey's actions would have supported a charge for felony fleeing. In response, White maintains that the jury needed to know what crimes he believed McCloskey had committed in order to gauge the reasonableness of his belief that McCloskey was dangerous.

{¶ 64} The trial court erred by precluding White from answering the question, "What charges on that evening did you feel you could file against Mr. McCloskey if you decided to do so?" The offenses that White believed McCloskey had committed were more probative than prejudicial and related to whether a reasonable officer would have believed that McCloskey could pose a threat. The court then compounded the error when it subsequently instructed the jury that, in evaluating the use of deadly force, it had to "consider factors *such as the severity of the crime Mr. McCloskey was believed to have committed*," without having allowed any testimony regarding what those alleged crimes might have been. (Emphasis added.)

{¶ 65} Without that testimony, the jury had no basis to conclude that McCloskey was believed to have committed any crimes, and it could not gauge whether the seriousness of those potential offenses would have alerted a peace officer to a potential threat, and therefore it could only weigh this factor against White.

{¶ 66} This proposition is therefore not well taken.

### Conclusion

{¶ 67} The firearm specification contained in R.C. 2941.145 cannot be applied to White in this case, because the facts demonstrate that he was a peace officer authorized and required to carry a firearm and he did not use the firearm to facilitate an offense; i.e., he acted within the course and scope of his law enforcement duties and there is no evidence that he abandoned his employment or substantially deviated from it. Application of the firearm specification under these circumstances is outside the scope of the General Assembly's intent in enacting the firearm penalty provision.

{¶ 68} Further, the trial court gave potentially misleading instructions to the jury regarding the use of deadly force and justification, and it erred in excluding evidence of the crimes that White believed McCloskey had committed—errors that undermined the jury's ability to gauge the reasonableness of White's perception of a threat to his or another's safety.

{¶ 69} Accordingly, the judgment of the appellate court is affirmed, and the matter is remanded to the common pleas court for further proceedings.

Judgment affirmed.

O'Connor, C.J., and Kennedy, French, and O'Neill, JJ., concur.

Pfeifer, J., concurs in part and dissents in part.

Lanzinger, J., dissents.

---

**O'Connor, C.J., concurring.**

{¶ 70} I concur in the majority opinion but write separately to emphasize the distinction we recognize regarding the application of R.C. 2941.145(A).

{¶ 71} The majority opinion concludes:

> Police officers who abandon their employment and depart from the course and scope of their law enforcement duties or deviate from departmental policy by engaging in criminal activity, as for example, by robbing a drug dealer at gunpoint, would subject themselves to a firearm specification because they have voluntarily chosen to engage in criminal activity.

Majority opinion at ¶ 36.

{¶ 72} But what if a jury finds that criminal liability attaches for a police officer's use of excessive force for something less than intentional criminal activity, such as an officer's mistake in judgment regarding the need to use the firearm? What if the jury determines that the use of the firearm was not justified under any circumstances? The question then becomes whether the R.C. 2941.145(A) firearm specification would apply.

{¶ 73} Here, White is subject to criminal liability based on an allegation of unreasonable force arising from a mistaken decision while engaging in his law-enforcement duties. There is no allegation that White abandoned his employment and intentionally engaged in criminal conduct. Thus, the crux of the issue is whether White's mistake of judgment in carrying out his official duties was reasonable, not whether White intentionally engaged in criminal conduct. And as part of his employment, White, like other similarly situated police officers, was required to carry *and use* a firearm if necessary. He did not carry or use his firearm to facilitate a criminal offense. Instead, he used it in an attempt to do his job.

{¶ 74} Under such facts, the application of the R.C. 2941.145(A) firearm specification, even upon a conviction for the underlying felonious-assault offense, leads to an unreasonable and absurd result. Thus, the R.C. 2941.145(A) firearm specification cannot be interpreted so broadly as to apply to an officer accused of, or convicted of, making an unreasonable or unjustified mistake of fact or judgment regarding a perceived threat while carrying out his or her official

duties. Accordingly, even if the jury finds on remand that White's use of his firearm was a mistake for which criminal liability must attach, the firearm specification does not apply to White under these facts.

{¶ 75} The dissenting opinion's summary of the facts overlooks the evidence regarding mistake. First, the dissent misleadingly cites the video evidence as "overwhelming support for the jury's verdict." Dissenting opinion at ¶ 83. But, as the appellate court noted, the jury also heard testimony from two defense experts that White did not have the same viewpoint as the camera in his cruiser that shot the video. 2013-Ohio-51, 988 N.E.2d 595, ¶ 37, 41 (6th Dist.). Next, the dissent omits any reference to the reason that White fired his weapon, a matter summarized in the appellate court's opinion through a review of White's testimony:

> From where he stood, White could not fully see McCloskey's right arm, nor his hands at all. McCloskey had turned forward, but then turned back to his right again. With his pistol aimed at McCloskey, White yelled "get your hands up." White described what he saw next: "He turned and looked at me, and with the right arm, made a reaching movement." Believing that McCloskey "was pulling a weapon," and fearing that his life and Sargent's life were in danger, White fired once. McCloskey fell to the ground and the motorcycle toppled on him.

*Id.* at ¶ 8.

{¶ 76} Regardless of the reasonableness of White's belief that McCloskey "was pulling a weapon" and that his life and his partner's life were in danger, White acted as a police officer throughout the incident. The evidence demonstrates that White did not abandon his job to engage in criminal activity. The only question, as the majority notes, is "the reasonableness of the force he used." Majority opinion at ¶ 38.

{¶ 77} Under these facts, the R.C. 2941.145(A) firearm specification can have no deterrent effect as intended. In fact, application of the specification would have the absurd result of deterring officers from carrying and using their firearms as mandated by their training and policies. The firearm specification would punish officers for doing what they are required to do—carry a firearm and use it if necessary. Because the purpose of the statute is wholly at odds with its application to police officers in these circumstances, it cannot be concluded that the statute is so intended.

{¶ 78} Additionally, as the appellate court recognized, the criminal prosecution of law-enforcement officers for on-duty conduct has been infrequent. 2013-Ohio-51, 988 N.E.2d 595, at ¶ 54. Thus, it cannot be assumed that the General

Assembly was aware of an overwhelming policy need to explicitly exclude police officers from the scope of the R.C. 2941.145(A) firearm specification.

{¶ 79} Lastly, the dissent reasons that "any human being, whether a police officer, a judge, or a priest, can commit an offense and be an 'offender,'" and therefore, the "law must apply to all or it applies to none." Dissenting opinion at ¶ 98. But under the current state of the law, a police officer carries the unique burden of being subject to *criminal* liability for a mistake in carrying out his or her employment duties that gives rise to an inquiry into the officer's use of force. That burden is not shared by a judge or a priest. For example, even if a judge mistakes or misapplies the law in the exercise of his or her duties as a member of the judiciary, the judge does not risk criminal liability for that mistake. There is no criminal inquiry into whether a reasonable judge would have acted the same way. And there is certainly no equivalent to a firearm-specification enhancement that could be made applicable for some required aspect of the judge's duties. That is not to make light of the serious consequences suffered by McCloskey as a result of White's actions here. Rather, it is simply to note that our jurisprudence, as well as the General Assembly as it enacts legislation, recognizes distinctions when necessary. Here, a distinction must be drawn regarding R.C. 2941.145(A) to avoid the absurdity resulting from the application of the firearm specification on these facts.

FRENCH, J., concurs in the foregoing opinion.

---

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 80} I dissent from the majority's holdings regarding the jury instructions on the use of force and the trial court's exclusion of the defendant's testimony about the offenses that he thought the victim had committed, and I join Justice Lanzinger's dissent on those two issues. I concur in the majority's judgment regarding the inapplicability of the firearm specification to the defendant and in the majority's judgments addressing the propositions of law involving pretrial dismissal based on civil immunity and a mistaken-belief jury instruction. Thus, I would reverse the judgment of the court of appeals regarding White's felonious-assault conviction, would affirm its judgment on the R.C. 2941.145(A) conviction, and would remand the case to the court of appeals for a consideration of the remaining assignments of error—regarding the manifest weight of the evidence and whether the trial court erred in imposing a seven-year sentence on the felonious-assault conviction—that the appellate court deemed moot.

Lanzinger, J., dissenting.

{¶ 81} I respectfully dissent, as I would reverse the judgment of the court of appeals and would reinstate the jury verdict in this case finding the defendant, Thomas Caine White, guilty of felonious assault with a firearm specification. I believe that the trial court did not abuse its discretion either in issuing its jury instructions or by excluding White's testimony on the crimes that he believed Michael McCloskey Jr. had committed. I would further hold that the firearm specification applies to White in this case.

### Additional Factual Background

{¶ 82} The tragedy in this case is that during a traffic stop a citizen was paralyzed after being shot in the back by an on-duty police officer. I wholeheartedly agree that law-enforcement officers perform a vitally important role in our society that requires them to make split-second, life-or-death decisions while under tremendous pressure. But they themselves may be subject to prosecution when their actions exceed the scope of their duties by violating criminal statutes.

{¶ 83} In its recitation of facts, the majority opinion does not mention that a video of the event recorded by the dashboard camera in White's cruiser was entered into evidence and played for the jury at several points during trial. The video provides overwhelming support for the jury's verdict.

{¶ 84} The video shows that before initiating the traffic stop, White followed the motorcycles of McCloskey and Aaron Snyder for approximately three minutes and 45 seconds. During this time, McCloskey's and Snyder's riding appears unremarkable. After stopping at an intersection for about 10 to 12 seconds, the two men accelerated quickly, and the video shows that White immediately activated his patrol car's lights and siren. White then pursued McCloskey for about 14 seconds, and McCloskey stopped his motorcycle. In a few moments, White exited his patrol car and simultaneously yelled and fired at McCloskey. The shooting took place about *three seconds* after White opened his police car door.

### The Jury Instructions Given

{¶ 85} I disagree with the majority opinion that the trial court committed reversible error in failing to properly instruct the jury, and I would hold that the jury instructions were a complete statement of law.

{¶ 86} The majority opinion faults the trial court for failing to explain when an officer in White's position is justified in using deadly force, but the trial court was clear at the beginning of the instructions on this point that it was the task of the jury to determine the reasonableness of the force used, instructing each juror to *"put yourself in the position of the defendant, with his characteristics and his*

*knowledge, and under the circumstances and conditions that surrounded him at the time."* (Emphasis added.) The United States Supreme Court has emphasized that this determination of reasonable force is fact-driven. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The trial court's jury instructions follow *Graham.*

{¶ 87} The majority opinion would require the trial court to explain that an officer in White's position would be justified in using deadly force "when there is probable cause to believe that the suspect poses a threat of serious physical harm to the officer or to others" pursuant to *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In *Garner,* the court held that it is not unreasonable for an officer to use deadly force to prevent the escape of a felony suspect where "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* at 11.

{¶ 88} I would not hold that the trial court's failure to quote *Garner*'s statement on deadly force in its jury instructions constitutes reversible error. While *Garner* dealt specifically with the use of deadly force and *Graham* dealt with excessive, nondeadly force, the opinion in *Graham* explicitly clarified the analysis set forth in *Garner:*

> Today we make explicit what was implicit in *Garner*'s analysis, and hold that *all* claims that law enforcement officers have used excessive force— deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

(Emphasis sic.) *Graham* at 395. *Graham*'s Fourth Amendment analysis accordingly controls, and I would hold that the trial court's jury instructions were a sufficient statement of law. A trial court is required to "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen,* 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. The trial court instructed the jury to consider whether McCloskey's actions "caused the defendant reasonably and honestly to believe that Officer Sargent or himself was about to be killed or receive great bodily harm." These instructions comported with both *Garner* and *Graham.*

{¶ 89} I agree with the majority opinion that the trial court's failure to provide a mistaken-belief instruction does not constitute plain error in this case. In short, there was no abuse of discretion by the trial court in its jury instructions,

and I would accept the arguments presented in the state's third and fourth propositions of law.

## Exclusion of Testimony

{¶ 90} I also would accept the state's argument that the trial court did not abuse its discretion in excluding White's testimony regarding the specific violations and the degree of any offense that White believed McCloskey may have committed. The majority opinion concludes that the offenses that White believed McCloskey had committed were more probative than prejudicial and related to whether a reasonable officer would have believed that McCloskey could pose a threat, and it further concludes that without White's testimony, "the jury had no basis to conclude that McCloskey was believed to have committed any crimes, and it could not gauge whether the seriousness of those potential offenses would have alerted a peace officer to a potential threat." Majority opinion at ¶ 65.

{¶ 91} I would hold that the trial court did not abuse its discretion in prohibiting White from telling the jury what crime or crimes he would have charged McCloskey with. The majority opinion reasons that the exclusion of this testimony prevented the jury from considering whether McCloskey was believed to have committed any crimes, from fully considering "factors such as the severity of the crime Mr. McCloskey was believed to have committed" pursuant to the jury instructions, and from determining whether the seriousness of McCloskey's potential offenses would have alerted a peace officer to a potential threat.

{¶ 92} But the jury was presented with ample evidence to consider these issues. It repeatedly viewed the video recording of the entire sequence of events, which provides comprehensive details of McCloskey's actions leading up to the shooting. White also testified extensively about his own perceptions of the events leading up to the shooting. During his trial testimony, White reviewed the video in front of the jury, offering a running commentary of traffic violations that he believed the motorcyclists may have committed. This evidence—the video recording and White's first-person testimony about the events in question— provided the jury with a full opportunity to consider the nature and seriousness of any potential offenses McCloskey may have committed and the effect of those potential offenses on White's perception of a potential threat.

## The Firearm Specification

{¶ 93} Because I would hold that the trial court did not abuse its discretion in issuing the jury instructions and excluding White's testimony regarding the offenses with which he would have charged McCloskey, I would uphold the jury's verdict finding White guilty of felonious assault. The remaining issue in this case

is whether the application of the R.C. 2941.145 firearm specification to White violated White's due-process rights.

{¶ 94} The majority opinion sidesteps the "as applied" constitutional challenge to the R.C. 2941.145 firearm specification. White contends that there is no rational basis for imposing a firearm specification on a police officer who possesses and uses his firearm while on duty because the legislative intent is to punish "criminals" for possessing and using firearms. The majority opinion suggests that this issue can be decided as a matter of statutory interpretation and asserts that "the statute requires that a distinction be drawn between a police officer who acts in accord with the duty to uphold the law and one who abandons that duty by committing a criminal offense." Majority opinion at ¶ 34. It reasons that White was permitted and required to carry the firearm pursuant to his official duties and that he did not abandon his employment or act outside the scope of his official duties in shooting McCloskey. It contrasts White's actions with those of a hypothetical officer who has "voluntarily chosen to engage in criminal activity" by robbing a drug dealer at gunpoint. *Id.* at ¶ 36.

{¶ 95} The statute, however, does not contain an exception for police officers or anyone else required to carry a firearm, and the majority's analysis ignores the jury's determination in this case that White acted criminally in shooting McCloskey.

{¶ 96} The majority opinion at least tacitly approves White's argument that R.C. 2941.145(A) does not apply to him because the firearm specification applies to "criminally-motivated conduct" rather than "a state actor's objectively-unreasonable-split-second-decision aimed to protect society." This argument uses semantics to ignore the clear language and intent of the statute and create an unwarranted distinction between "criminals" and "police officers."

{¶ 97} R.C. 2941.145(A) imposes a mandatory three-year prison term for offenses committed when "the *offender* had a firearm on or about the offender's person or under the *offender*'s control while committing the *offense* and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or *used it to facilitate the offense.*" (Emphasis added.) Rewording the statute to substitute the word "criminal" for "offender" changes the clear meaning of the statute, which is written to apply to all *offenders.* The statute does not except anyone from its purview, and neither status nor occupation is determinative.

{¶ 98} Police officers are human. We know that any human being, whether a police officer, a judge, or a priest, can commit an offense and be an "offender." The law must apply to all or it applies to none. The majority acknowledges that an officer who participates in criminal activity is not within the scope of the officer's duty because officers have no license to commit crimes. But its analysis

ignores a fundamental point: *A jury found White guilty.* He committed the offense of felonious assault by knowingly shooting McCloskey with a firearm, making White an offender. His use of the firearm to facilitate the offense makes him subject to the firearm specification. The majority's distinction between White and its hypothetical officer who robs a drug dealer at gunpoint is therefore irrelevant. Both are offenders subject to R.C. 2941.145(A)'s firearm specification.

{¶ 99} While it cannot be debated that police officers often are the first responders and that they must make split-second decisions regarding the use of force, in this case the jury determined unanimously that White's actions were not those of a reasonable officer under the circumstances. The majority should uphold the jury's verdict and abstain from reweighing the facts of the case.

{¶ 100} The majority opinion states that subjecting officers to criminal liability under R.C. 2941.145 belies the legislative purpose in enacting it because the statute cannot deter an officer from possessing a firearm that he is required to carry. I disagree. First, the statute does not subject officers like White to criminal liability for *possessing* a firearm. Rather, it subjects them to criminal liability for *using* a firearm—using the firearm *while committing a criminal offense.* Second, the purpose of the statute is to reduce gun violence, regardless of who commits the crime.

{¶ 101} Recent high-profile incidents have occurred in which police officers have been accused of using unwarranted deadly force on citizens. It is obvious that there is a pressing need for officers to exercise the utmost caution in discharging their firearms while at the same time protecting their own safety. But as the public attention on this controversial matter shows, issues of the type presented here deserve the full consideration and debate of the legislative process. I believe that the General Assembly, rather than the seven justices of this court, should make this public-policy decision.[1]

{¶ 102} I conclude that subjecting White to criminal liability under R.C. 2941.145 is rationally related to its purpose—to deter the use of firearms in committing crimes.

### Conclusion

{¶ 103} This is admittedly a troubling case. Nevertheless, we are called upon to look beyond any sympathy we may have for the victim, who has suffered

---

1. Imposing liability on White pursuant to the firearm specification would comport with the analysis in an analogous case from Michigan, *People v. Khoury*, 181 Mich.App. 320, 448 N.W.2d 836 (1989). There, the court upheld the application of a gun specification to an on-duty officer who shot and killed a knife-wielding individual. The court noted, "We know of no public policy consideration that would justify granting police officers immunity from criminal prosecution for their criminal acts." *Id.* at 328. Subsequent to the decision in *Khoury*, the Michigan legislature amended the relevant statute to create an exception for on-duty officers. *See People v. Khoury*, 437 Mich. 954, 467 N.W.2d 810 (1991).

significant injury, or White, who received a significant sentence[2] as a result of actions taken while on duty as an officer of the law. Rather than substitute myself as a fact-finder in this case, I would uphold the jury verdict. The trial court did not abuse its discretion in issuing its jury instructions or excluding White's testimony about what crimes he may have charged McCloskey with, and the firearm specification contained in R.C. 2941.145 clearly applies to White in this case. I dissent and would reverse the judgment of the court of appeals.

Julia R. Bates, Lucas County Prosecuting Attorney, and Evy M. Jarrett, Assistant Prosecuting Attorney, for appellant.

Timothy Young, Ohio Public Defender, and Peter Galyardt, Assistant Public Defender, for appellee.

Dean Holman, Medina County Prosecuting Attorney, and Matthew A. Kern, Assistant Prosecuting Attorney, urging reversal for amicus curiae Ohio Prosecuting Attorneys Association.

Crabbe, Brown & James, L.L.P., Larry H. James, Christina L. Corl, and Daniel J. Hurley; and Paul L. Cox, urging affirmance or dismissal for amici curiae the National Fraternal Order of Police and Fraternal Order of Police of Ohio, Inc.

---

2. It should be noted that if we were to reverse the judgment of the Sixth District, this cause would be remanded to the court of appeals for it to address White's fifth assignment of error, which challenged his ten-year sentence and which was found to be moot. The appellate court also found another assignment of error moot and did not address it.