JENSEN, J.
{¶ 1} This is an appeal from a judgment of the Erie County Court of Common Pleas which, following a jury trial, found appellant guilty of one count of assault. For the reasons set forth below, the judgment of the trial court is affirmed.
{¶ 2} Appellant, Aaron C. Bolton, was a uniformed Vermilion police sergeant on duty the early morning hours of September 6, 2015. Appellant was the first of three uniformed Vermilion police officers to respond to a dispatch call for a disturbance at Rudy's Bar & Grill where Jacob Johnson, a 21-year-old bar patron, was involved in a fight with others. Mr. Johnson was eventually arrested on two charges of resisting arrest and one charge of disorderly conduct. However, as a result of appellant's actions as a police officer against Mr. Johnson in the course of that arrest, criminal charges were pursued against appellant.
{¶ 3} On April 14, 2016, a Wood County Grand Jury indicted appellant for Count 1, felonious assault, in violation of R.C. 2903.11(A)(1), a second-degree felony with a specification that appellant did cause or threaten to cause physical harm during the commission of the offense, and Count 2, assault, in violation of R.C. 2903.13(A), a first-degree misdemeanor.
{¶ 4} On October 27, 2016, the lesser included offense to Count 1, aggravated *548 assault, in violation of R.C. 2903.12(A), was added and included in the trial court's instructions to the jury.
{¶ 5} Following the jury trial held October 24 to 27, 2016, the jury found appellant not guilty of Count 1, felonious assault and the lesser included Count 1 offense of aggravated assault, and found appellant guilty of Count 2, assault. The jury verdict was journalized November 11, 2016.
{¶ 6} Subsequently on December 12, 2016, the trial court held the sentencing hearing for Count 2. The trial court sentenced appellant to serve a prison term of 180 days, which was suspended for the imposition of three years of community sanctions after first serving 120 days in prison. The trial court journalized the sentencing judgment entry on December 12, 2016.
{¶ 7} It is from the trial court's December 12, 2016, journalized judgment entry that appellant filed his appeal on December 13, 2016.
{¶ 8} Appellant sets forth one assignment of error:
The trial court erred when the jury found Appellant guilty of one count of Assault because they believed that force used by Appellant was not reasonable and necessary to arrest Jacob Johnson.
{¶ 9} Appellant argues he met his burden of proof for the affirmative defense of use of force in the exercise of his official police duties because the force he used was reasonable and necessary under the specific circumstances he faced to secure the lawful arrest of Mr. Johnson. Appellant argues that a preponderance of evidence at trial showed appellant's reasonable use of force was continuously adjusted in response to Mr. Johnson's changing conduct during the course of his resisting arrest. Appellant urges this court to reverse his conviction because the "jury clearly ignored the trial court's jury instructions regarding the use of force and [his] affirmative defense" by relying on "the prohibited territory of second-guessing and 'armchair reflection.' This includes comparative speculation, couched in backward-looking terms, about what the officer 'could have' or 'might have' done differently, and whether he 'should have' employed alternate or lesser means of force, or different tactics." Finally, appellant argues it is not clear which specific action by appellant was considered by the jury to be the "actual act of misdemeanor assault."
{¶ 10} In response appellee argues the trial court decision was not against the manifest weight of the evidence. Appellant did not meet his burden of proof for the affirmative defense because the evidence by appellee's expert witness, Samuel Faulkner, showed "appellant's conduct was with malicious purpose, in bad faith, and that appellant acted in a wanton, reckless manner." Appellee argues numerous witnesses "testified that appellant's actions were not reasonable." Appellee further argues the evidence did not show "that Johnson was a danger to the officers or was capable of flight."
{¶ 11} "A challenge to the weight of the evidence questions whether the greater amount of credible evidence was admitted to support the judgment than not." Flowers v. Siefer , 6th Dist., 2017-Ohio-1310, 88 N.E.3d 599, ¶ 94. This court has repeatedly stated that in determining whether a verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way to create such a manifest miscarriage of justice as to require a new trial. State v. Reynolds , 6th Dist., 2017-Ohio-1478, 89 N.E.3d 235, ¶ 47. A conviction will be overturned *549 only in exceptional cases. Id. Every "reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." Flowers at ¶ 94.
{¶ 12} It is well established that the trier of fact has the sole duty to decide what weight should be given to the testimony of any witness, including experts. Kokitka v. Ford Motor Co. , 73 Ohio St.3d 89, 92, 652 N.E.2d 671 (1995) ; State v. DeHass , 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. We will not reverse those decisions absent an abuse of discretion where the record shows the decision was unreasonable, arbitrary or unconscionable. Flowers at ¶ 59 ; Kinn v. HCR ManorCare , 2013-Ohio-4086, 998 N.E.2d 852, ¶ 14 (6th Dist.).
{¶ 13} In order for the jury to find appellant guilty of assault on or about September 6, 2015, in Erie County, Ohio, appellee must prove beyond a reasonable doubt that appellant knowingly caused or attempted to cause physical harm to Mr. Johnson. R.C. 2903.13(A). Appellee presented evidence at trial of three alleged assaults by appellant: 1) striking Mr. Johnson in the face at least once with a closed fist, 2) repeatedly striking Mr. Johnson's head with a police car rear door, and 3) striking Mr. Johnson in the back of the head with a closed fist. Appellant correctly states the record fails to show which of these allegations was the basis for the jury's decision.
{¶ 14} If the jury believed all of the evidence in the record, despite some contradictions, by all accounts September 6, 2015, was not a good day for Mr. Johnson. Mr. Johnson remembers either nothing or very little from the time the fight broke out inside the bar: "[I]t's kind of a blur from there * * * I mean it's just bits and pieces throughout the whole night." Mr. Johnson testified at trial:
Q: So you don't remember too much from that night?
A: No, not really. No.
{¶ 15} Mr. Johnson, however, testified he clearly recalled his nose being broken that night, but that he did not require immediate treatment:
Q: Was [your nose] broken before you went out in the back parking lot [of the bar]?
A: No, it was broken by Mr. Bolton.
Q: Okay. Any treatment or-that you had after that for the broken nose ?
A: No treatment, just X-rays, and they said that it was broken, and then I went to the hospital the day after because I couldn't walk.
{¶ 16} Mr. Johnson also testified he clearly recalled being intoxicated: "On a scale of 1 to 10, probably a 9. I was pretty intoxicated." According to the record he began drinking at his girlfriend's home with her father, Tom Skully, the evening of September 5, 2015, and continued drinking at another local bar and finally ended up at Rudy's Bar & Grill, where he spent more time drinking with Mr. Skully and other friends until about 2:00 a.m. The fight started inside the bar and then moved outside. The record reflects Mr. Johnson's arrest occurred during the next hour from the time Mr. Johnson was found fighting outside Rudy's Bar in Vermilion until he was finally subdued enough to receive medical treatment at Mercy Hospital in Lorain.
{¶ 17} The record also shows that before, between, and after the three alleged assaults by appellant, and during this same one-hour period, Mr. Johnson suffered numerous other physical incidents from others, including from bar patrons, bar staff, friends, police officers, hospital security, and himself. The additional physical incidents *550 that occurred can be generally described as two punches to Mr. Johnson's face, five punches to his body, three pepper sprays to his face, 17 rough man-handlings of him, and Mr. Johnson's own kicking and head banging in the police car during each of his transportation segments. None of those incidents are the subject of this litigation.
{¶ 18} An essential element of the crime of assault is appellant acting knowingly against Mr. Johnson. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. * * * When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." R.C. 2901.22(B).
{¶ 19} A police officer does not act knowingly if he successfully presents evidence of a "reasonable but mistaken belief as to the facts that prompted him to act." State v. White , 2013-Ohio-51, 988 N.E.2d 595, ¶ 121 (6th Dist.).
{¶ 20} Appellant asserted "justification" as an affirmative defense, claiming that his use of force on Mr. Johnson was justified in the exercise of his official duties as a police officer. An affirmative defense of justification is defined as a "defense involving an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence." R.C. 2901.05(D)(1)(B). "Justification" is "merely a genus label for any affirmative defense which functions to excuse admitted conduct that is otherwise unlawful." White at ¶ 137.
{¶ 21} Appellant must prove his affirmative defense of justification by a preponderance of evidence. R.C. 2901.05(A). "Preponderance of the evidence is defined as 'that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its nonexistence.' " In re Z.G. , 6th Dist. Erie No. E-12-063, 2013-Ohio-2482, 2013 WL 3057228, ¶ 31. Appellant did not convince the jury.
{¶ 22} The record is replete with evidence of Mr. Johnson's ceaseless resistance to arrest by appellant and Officer David Jones, the second uniformed Vermilion police officer to arrive at the scene. Mr. Johnson's resistance cannot be excused unless there was "excessive or unnecessary force by an arresting officer." Columbus v. Fraley , 41 Ohio St.2d 173, 175, 324 N.E.2d 735 (1975), paragraph three of the syllabus ("In the absence of excessive or unnecessary force by an arresting officer, a private citizen may not use force to resist arrest by one he knows, or has good reason to believe, is an authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances"). It is undisputed at all relevant times appellant was an authorized police officer engaged in the performance of his duties. The jury found appellant used excessive or unnecessary force on Mr. Johnson.
{¶ 23} "Force" is "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). An arresting officer's use of force during the arrest of a person who is resisting that arrest is expected to involve "force" as defined by statute. White at ¶ 57. Moreover, at common law a law enforcement officer has a privilege to use reasonable force in the discharge of his official duties.
*551 State v. White , 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 14, 17.
{¶ 24} A police officer's use of non-deadly force is reasonable "if the jury is merely persuaded that a reasonable officer in the same situation could have believed the same force was necessary." White , 2013-Ohio-51, 988 N.E.2d 595, at ¶ 60. Appellant did not persuade the jury.
{¶ 25} To determine the "objectively reasonable" police officer's use of force, there is no precise calculation; rather, the standard takes into account the totality of the circumstances confronting the police officer, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." White , 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, at ¶ 23.
{¶ 26} Without any reliance on "the 20/20 vision of hindsight" or armchair reflection, a fact finder must look only to what a reasonable police officer would have done in appellant's shoes at the scene, perceiving what appellant then perceived and acting within the limits of appellant's knowledge or information as it then existed. Id. ; White , 2013-Ohio-51, 988 N.E.2d 595, at ¶ 72-73. Those actions and perceptions in the moment can be mistaken and still be objectively reasonable. White , 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, at ¶ 60. During an arrest "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Graham v. Connor , 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The police officer's underlying intent or motive is irrelevant in a reasonableness analysis. Id. Conclusory testimony disguised as expert opinion is inadmissible for the objectively reasonable determination. White , 2013-Ohio-51, 988 N.E.2d 595, at ¶ 76.
First Alleged Assault: Closed Fist Strike of Mr. Johnson's Face
{¶ 27} First we will review appellant's alleged closed fist strike of Mr. Johnson's face while Mr. Johnson was resisting handcuffing outside the bar in the parking lot. Appellant did not testify at trial, so to know his beliefs as to the facts and his perceptions of the incident is from other sources. The record contained a transcript of his testimony to the grand jury and his police report.
{¶ 28} After appellant secured the first handcuff on Mr. Johnson while Mr. Johnson was face down on the ground, appellant felt Mr. Johnson twist and grab with his free hand appellant's leg to bring him to the ground. Appellant believed Mr. Johnson's action was a threat to him and the bystanders, especially if Mr. Johnson got access to appellant's weapons. Mr. Johnson repeatedly ignored appellant's verbal commands. Appellant reacted to Mr. Johnson's leg grab by striking the only visible target to him at his angle looking down on Mr. Johnson. Appellant admitted to one strike to Mr. Johnson's face, but appellee alleged there were two strikes shown in the enhanced body camera video. Then Officer Jones arrived at the scene to assist appellant, and Officer Jones struck Mr. Johnson twice to the right side of his torso with a closed fist, which subdued Mr. Johnson long enough to get his other hand handcuffed. Appellant believed his closed fist strike of Mr. Johnson's face while Mr. Johnson was resisting handcuffing was within Vermilion Police Department's use of force policy.
{¶ 29} Officer Jones testified at the trial, and his police report is included in the trial *552 record. He confirmed seeing Mr. Johnson grabbing appellant's leg. He admitted to delivering two closed fist strikes to Mr. Johnson's shoulder to force him to let go of appellant's leg: "[H]e had a hold of Sergeant Bolton's leg, so I thought that that [sic] would be a good spot to strike him." However, he did not feel he needed to also strike Mr. Johnson's face. "I just feel [sic] that I didn't need to hit him in the head at the time * * * it wasn't my leg-that wasn't being grabbed." Specifically, Officer Jones testified that in the conditions perceived by appellant, a strike to the face could be reasonable.
Q: So * * * the fact that it was dark, we had all these people, he was being pulled to the ground, the only place he could hit was the face, you would feel that was okay?
A: If that's how Sergeant Bolton felt, then yes.
{¶ 30} Finally, Officer Jones testified even if the threat of harm to appellant and others posed by Mr. Johnson was a mistake, he still believed Mr. Johnson was attempting to pull appellant down.
{¶ 31} Appellant's expert on police use of force, Gregory Ellifritz, testified appellant could not have faked or staged the strike to Mr. Johnson because appellant's body camera video confirmed two, separate verbal commands by appellant to Mr. Johnson to let go, first of his foot, and then of his leg. "If he was faking something, he would probably be consistent * * * but the fact that he changed from foot to leg * * * tells me that * * * the suspect was trying to get a better hold on him, and that makes me believe that it wasn't faked."
{¶ 32} Appellee's expert witness on police use of force, Samuel Faulkner, admitted that appellant's repeated verbal commands to Mr. Johnson to let go of his leg could reasonably mean that appellant believed someone was grabbing his leg and had not let go. However, in his opinion appellant either faked or staged the scuffle with Mr. Johnson in order to strike Mr. Johnson's face and fracture his nose without justification.
{¶ 33} Appellee also called as witness Christopher Hartung, the Vermilion Police Chief. Chief Hartung testified that appellant's police report did not quite "jive" with him, so he wanted a further review. In the course of that review, Chief Hartung sought to enhance appellant's body camera video to lighten it for better viewing. Although clearer "it was still pretty pixilated" in the enhanced version and Chief Hartung became primarily concerned about the other two alleged assaults on Mr. Johnson. For that reason he referred the investigation to the Erie County Sheriff's Department. Detective Sergeant Nicholas Kostopoulos of the Erie County Sheriff's office investigated the alleged assaults by appellant on Mr. Johnson.
{¶ 34} Sergeant Kostopoulos testified at trial appellant's body camera video had to be further artificially enhanced because it was "hard to * * * see anything in the original video, so I wanted to corroborate every * * * fact that was in the report as best we could with the video." Sergeant Kostopoulos confirmed the body camera audio indicated appellant yelled, "Let go of my foot. Let go of my leg I believe is-yes, correct." Sergeant Kostopoulos, like Chief Hartung, did not form a specific opinion about the first alleged assault because he was primarily concerned about the other two alleged assaults on Mr. Johnson.
{¶ 35} State Trooper Andrew Geer testified he saw appellant and Officer Jones reviewing the unenhanced body camera video footage at the police station later that morning: "From what I recall, they were watching the body camera, and I *553 couldn't make it out, it was real shaky, too dark. It was-to me it looked distorted, I didn't-I couldn't really see it." Trooper Geer testified appellant stated that Mr. Johnson grabbed appellant's leg during arrest and appellant "punched him in the face." When Trooper Geer reacted that in his department that's considered lethal force and they can't do that, he said appellant replied, "He-he goes, yes, yes I can, I'm a self-defense instructor."
{¶ 36} Officer Sean Bailey of the Vermilion Police Department testified that he also saw appellant and Officer Jones reviewing the unenhanced body camera video at the police station later that morning: "I don't know if it was Sergeant Bolton, or Patrolman Jones, I don't remember per say which one, but one of the two were bragging about, you know, how-how beat up [Mr. Johnson] got, and he was bloody, you know."
{¶ 37} Given the jury's role to weigh the evidence supporting and rebutting appellant's perception of Mr. Johnson trying to bring appellant to the ground at the time appellant struck him in the face, a rational jury could reach its conclusion to convict appellant of assault without justification for striking Mr. Johnson in the face during arrest.
Second Alleged Assault: Car Door Strikes of Mr. Johnson's Head
{¶ 38} Next we review appellant's alleged closing Officer Jones' patrol car's rear door repeatedly on Mr. Johnson's head. This alleged assault occurred after appellant and Officer Jones were finally able to handcuff Mr. Johnson, and Mr. Johnson refused to walk to Officer Jones' police car. Mr. Johnson had become dead weight and forced appellant and Officer Jones to drag Mr. Johnson from where he was handcuffed to the police car.
{¶ 39} According to appellant's police report and grand jury testimony, once Mr. Johnson was dragged to the police car, he continued to actively resist arrest by refusing to get into the back seat of the police cruiser and, once inside with one door closed, refused to stay in the car. Appellant believed Mr. Johnson was trying to exit the police car by pushing off the opposite door, which was closed:
I walked around to the other side of the car and reached in pulling Johnson into the back seat of the cruiser by using a wrist lock. Ptl. Jones closed the door on his side of the car and Johnson then pushed off that door trying to get out on my side. He stuck his head and shoulders out of the vehicle and refused to sit up. I ordered him several times to get in the vehicle and attempted to close the door but he would not comply and kept trying to put his head in the way of me closing the door.
{¶ 40} Another description in the record of appellant's perspective of this incident came from appellant's grand jury testimony:
So when we get the cruiser door open, we go to put Johnson in the cruiser, he's refusing to comply, refused to get into the car, just will not cooperate with any of our commands. So now I go around to the other side of the car, I climb in, I grab him by his arms and pull him into the cruiser and at that time Officer Jones was able to shut the door. Once he did that, then * * * Johnson pushed off that door that was closed and started leaning out the other side. As I was trying to close it, I'm yelling at him to get his head out, get in the car, get his head out, as I'm trying to shut the door, which is striking him in the shoulder. * * * I did that I think two or three times, yelling at him, he wasn't complying * * *. The intention is [sic] giving *554 him the verbal commands shutting the door hoping that he would pull himself into the car.
{¶ 41} Another incident description in the record came from Officer Jones' police report:
Sgt. Bolton and I then helped Johnson to his feet and he was ordered to walk to the cruiser. Johnson refused and kept dropping himself to the ground in an attempt to become "dead weight." Johnson was again helped to his feet and again he refused to walk. Johnson was then drug to the cruiser with his feet dragging the ground. Johnson was then ordered to sit in the cruiser to which he refused. He was given several verbal commands to do so and still refused to sit in [the] cruiser. Sgt. Bolton assisted Johnson in the back seat of the cruiser and the left rear cruiser door was closed. Johnson then attempted to exit the cruiser from the right rear door and Sgt. Bolton began ordering him back into the cruiser. Sgt. Bolton attempted to close the cruiser door several times and each time he did so, Johnson attempted to exit the cruiser. Sgt. Bolton then pushed Johnson into the cruiser by his body and pushed him towards the driver's side. Sgt. Bolton was then able to close the cruiser door. While in the cruiser Johnson continued to yell and began to spit on the partition and the seat. Johnson was kicking the cruiser's door panel and screaming.
{¶ 42} Officer Jones testified at trial he believed Mr. Johnson was trying to get out of the car on appellant's side:
Q: And how-how was [Johnson] put in the car?
A: Sergeant Bolton pulled him into the car from the rear passenger side.
Q: Okay. And then where was your attention drawn to?
A: The crowd.
Q: Okay. So did you hear Sergeant Bolton at any time say anything about getting in the car?
A: He did. He was ordering Mr. Johnson to-to get in the car.
* * *
Q: What is your thought process at that time [of appellant closing the opposite door] as far as what Johnson's doing?
A: That the subject's trying to exit the car from the other side.
Q: And what's that based upon?
A: My training and experience as a police officer.
* * *
Q: And when you were on the driver's side of the car attending to the crowd, did you happen to look back maybe once briefly to see the door closing?
A: I did.
Q: And did you see the door closing and Sergeant Bolton try to close it?
A: Yeah. Yeah.
Q: And was it your impression that he was pushing the door, or slamming it?
A: Just trying to close the door. I thought [Bolton] was just trying to close the door to get, you know, the door closed. I thought Johnson was trying to get out of the car.
{¶ 43} Officer Jones admitted he eventually viewed the enhanced body camera video. "After reviewing the [enhanced] video it appeared to me, the brief seconds that I watched the video, that Johnson was laying down flat, and was struck in the head with the door." This was a different impression from when he viewed the original body camera video.
{¶ 44} Mr. Faulkner repeatedly testified he had "no complaint" with appellant's going to the opposite side of the police cruiser, *555 opening the door and pulling Mr. Johnson into the back seat. Mr. Faulkner, however, believed appellant then used the police car door as a deadly weapon on Mr. Johnson's head, even though he testified, "I don't believe I could see that with a clarity [in the enhanced video] that I * * * could say [the door closed on the head]. I don't see how it couldn't have made some contact with it, but I can't say I specifically saw that." Mr. Faulkner explained, "[W]e've got a person who has been punched, very possibly could concuss from this, sprayed with an aerosol agent, we know is intoxicated, later on we learn that he's hypoglycemic, and he's also taking medication for mental problems, and were expecting a person in that condition, who's handcuffed behind his back, to sit up." The record did not include any evidence that appellant knew of Mr. Johnson's medical conditions during the alleged assault.
{¶ 45} Mr. Faulkner testified he did not believe appellant's police report that Mr. Johnson pushed off the closed door or that Mr. Johnson tried to get out, even though he admitted the enhanced video did not show Mr. Johnson's feet or clearly show the door striking Mr. Johnson's head rather than his shoulder. He believed appellant wrote things in his report to "make the officer's responses in this case reasonable. That concerns me." Mr. Faulkner held this belief even if appellant, in the chaos of the situation and the dark lighting conditions, couldn't see the door was striking Mr. Johnson's head: "If he could see it, I don't know."
{¶ 46} Mr. Ellifritz testified why the body camera video, even in its enhanced format and slowed down, did not support the allegations against appellant.
Q. Were you able to see Sergeant Bolton grab Johnson by the neck, and pull him down into the door?
A: No, I did not see that. * * * No, it appeared like Sergeant Bolton was pulling him to get him into the cruiser. I didn't see him pull * * * his head outside. * * * I saw Sergeant Bolton pull him, that is the position that prisoners end up in when they're pulled, and their hands are behind their back * * * that's the standard tactic that a second officer would use to pull an officer through from the other side. * * * He was seated, but he started pushing with his legs on the other door of the cruiser, which changed his body position.
Q: Did you see that?
A: No, but his body action is consistent with that type of an activity.
Q: Did you see him push off the other door?
A: No, it's not visible in the camera.
{¶ 47} Mr. Ellifritz further testified another reason the allegations against appellant are not supported by the body camera video is because the audio and video do not match appellee's assault theory: "I don't believe [Mr. Johnson] was being struck in the head [by the door]. * * * I believe that he was probably being struck by another part as he was [pushing off the closed door]. I think the noise would have been significantly louder, and there would have been injuries present if he was struck in the head by the car door."
{¶ 48} Mr. Ellifritz further testified what appellant was trying to do was reasonable under the circumstances:
I didn't-from the video it did not appear to me like Sergeant Bolton was trying to strike him with the * * * cruiser door. It appeared to me like he was trying to use the cruiser door to push the guy inside. If he wanted to strike him, he wouldn't have been telling him constantly get in the car, get in the car, get in the car. It appeared to me *556 like Sergeant Bolton was attempting to close the door as fast as possible to get that prisoner secured so that he could go help out the other officer [Holmes] who was dealing with a potentially armed suspect.
{¶ 49} The record shows that concurrently with Mr. Johnson's resisting arrest there was a radio call from Officer Holmes, the third police officer to arrive at the scene, who was trying to locate and apprehend another suspect, signaling to appellant he needed assistance. Officer Holmes testified at the trial that when he finally located the other suspect hiding in the bushes, "[I] announced myself; started ordering him to show me his hands, to come out of the bushes. At that time, he was non-compliant, he wouldn't come out initially. I believe I got on the radio and advised of that situation." The record shows at the point of Officer Holmes' radio call alerting appellant of his need for assistance, appellant stopped giving verbal commands to Mr. Johnson to get in the police car, went to the other side of the police car to pull Mr. Johnson in, Officer Jones then closed the first door, and appellant then proceeded to try to close the other door.
{¶ 50} Chief Hartung testified that under the dark lighting conditions reflected in appellant's original body camera video, appellant's actions had "[n]othing to take action on." Until the original video was artificially enhanced to make the scene "brighter," there was "nothing here to base what the [assault] allegations are." After viewing the enhanced body camera video Chief Hartung believed appellant did not take proper care "to make sure that the suspect's head is not in the way of the door, not vice versa. I mean, there's [sic] closing a car door on a suspect would not be-I can't think of any explanation or any rational reason for that."
{¶ 51} Sergeant Kostopoulos testified about his impressions from the enhanced body camera video: "[I]t's pretty dark in the back of the car, even when we lighten and change the contrast." As he described the enhanced video, "It shows the body camera distance close in, and then a reach for Jacob Johnson, pulls him down, then the door starts being closed on Jacob Johnson with commands [to] get in the car." Sergeant Kostopoulos concluded from what he saw in the enhanced video that appellant intentionally pulled Mr. Johnson down on the back seat so his head was positioned for door slamming even though appellant is heard on the video giving Mr. Johnson contrary verbal commands to get in the car.
{¶ 52} Given the jury's role to weigh the evidence supporting and rebutting appellant's perception of the situation with Mr. Johnson actively resisting arrest during his placement into the back seat of Officer Jones' police car, a rational jury could reach its conclusion to convict appellant of assault without justification for striking Mr. Johnson's head with the police car rear door during arrest.
Third Alleged Assault: Strike to Mr. Johnson's Head
{¶ 53} Next we will review appellant's alleged closed fist strike to the back of Mr. Johnson's head while in the back seat of Officer Jones' police car. This alleged assault occurred immediately after appellant allegedly assaulted Mr. Johnson's head with the police car rear door. According to appellant's police report, appellant believed Mr. Johnson was actively resisting arrest and trying to spit blood and mucous at him:
I continued to order [Johnson] to get [into] the vehicle and he replied with "f*** you b****." Using reasonable force I was able to lift Johnson up and place him fully inside the vehicle. While *557 doing so I had my left hand behind Johnson's neck and my right hand on his shoulder. As I lifted him to a sitting position he turned and it appeared that he was about to spit at me. I then quickly pushed his head and turned his face away from me with my right hand. I was then able to close the door.
{¶ 54} According to appellant's grand jury testimony:
[Johnson] wasn't complying, so then I sat him up into a sitting position. During this he's yelling, cussing, blood and spit is flying everywhere. He turns his head, and to avoid myself getting spit at, I use open hand and pushed his head away from mine quickly, was able to back out and close the door. * * * Yes, I used an open hand to turn his head away from me so I didn't get blood and spit on me.
{¶ 55} Officer Jones testified at trial from his position outside the car he did not see appellant strike Mr. Johnson in the back seat, but his police report confirmed Mr. Johnson's spitting and belligerent conduct after appellant sat Mr. Johnson up in the back seat and closed the car door: "While in the cruiser Johnson continued to yell and began to spit on the partition and the seat. Johnson was kicking the cruiser's door panel and screaming."
{¶ 56} At trial Chief Hartung testified, "I think [Bolton's] * * * understanding was that he felt that the individual was turning and trying to spit on Sergeant Bolton so Sergeant Bolton's response was to keep him from turning his head to do so." However, Chief Hartung believed the enhanced video showed appellant using a closed fist to the side of Mr. Johnson's face rather than an open palm. Even though both responses would be justified under his department's use of force policy based on the officer's perception, Chief Hartung was suspicious of the inconsistency between what he believed the enhanced body camera video showed and what appellant wrote in his report.
{¶ 57} Sergeant Kostopoulos believed the enhanced video did not show Mr. Johnson turning his head towards appellant, so he concluded appellant was not justified striking Mr. Johnson's head.
{¶ 58} Even with the enhanced body camera video slowed way down, appellant's expert, Mr. Ellifritz, testified he saw appellant only use an open hand to push Mr. Johnson's face away:
Q: [Enhanced video was played.] You didn't see [Bolton] hit [Johnson] with a closed fist?
A: I did not see him hit him with a closed fist. * * * [Enhanced video was replayed and slowed down.] I saw a fist and then by the time that struck I saw fingers, which tells me that it's an open hand. * * * [Enhanced video was replayed again and further slowed down.] There's a fist, and I saw fingers before I saw the initial contact.
{¶ 59} Although appellee's expert, Mr. Faulkner, believed the enhanced video showed appellant striking Mr. Johnson with a closed fist with no danger of Mr. Johnson's spit of blood and mucous, he acknowledged that appellant's perception could have been that Mr. Johnson posed a threat: "[Bolton] could certainly perceive [Mr. Johnson's spit of blood and mucous] was a threat." Mr. Faulkner echoed his earlier concern that appellant crafted his police report to look reasonable: the discrepancy between appellant's police report stating he pushed Mr. Johnson's face away where Mr. Faulkner believed appellant punched Mr. Johnson. In either event, Mr. Faulkner did not believe appellant was justified to touch Mr. Johnson's head. Rather, even if appellant "perceived [Mr. Johnson's spit of blood and mucous] was a threat, he can move out of the way."
*558 {¶ 60} Given the jury's role to weigh the evidence supporting and rebutting appellant's perception of the situation with Mr. Johnson trying to spit blood and mucous at him while in the back seat of Officer Jones' police car, a rational jury could reach its conclusion to convict appellant of assault without justification for striking Mr. Johnson's head with either an open or closed fist during arrest.
{¶ 61} We reviewed the entire record in this case and do not find the jury lost its way or created a manifest miscarriage of justice in determining appellant's guilt for assault beyond a reasonable doubt. We will not disturb the jury's findings.
{¶ 62} Appellant's sole assignment of error is not well-taken.
{¶ 63} On consideration whereof, we find that substantial justice has been done in this matter. The judgment of the Erie County Court of Common Pleas is affirmed. The bond and stay of execution of sentence entered by this court on December 29, 2016, is hereby withdrawn. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.
Judgment affirmed.
Mark L. Pietrykowski, J.
Christine E. Mayle, P.J.
CONCUR.