[Cite as *Cleveland v. Graham*, 2024-Ohio-336.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CITY OF CLEVELAND,                               :

    Plaintiff-Appellee,                      :

                              No. 112103

    v.                                       :

CHRISTOPHER GRAHAM,                              :

    Defendant-Appellant.                     :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 1, 2024

---

Criminal Appeal from the Cleveland Municipal Court
Case No. 2017CRB021726

---

### *Appearances:*

Mark D. Griffin, Cleveland Director of Law, Aqueelah
Jordan, Chief Prosecutor, and Susan M. Oates, Assistant
Director of Law, *for appellee.*

Friedman Nemecek & Long, L.L.C., Eric C. Nemecek, and
Mary K. Walsh, *for appellant.*

LISA B. FORBES, J.:

{¶ 1} Christopher Graham ("Graham") appeals his conviction for misdemeanor assault. After reviewing the facts of the case and pertinent law, we affirm the trial court's decision.

## I. Facts and Procedural History

{¶ 2} On September 12, 2017, Graham, who was a Cleveland police officer at the time, was dispatched to the scene of a fight with a report of a firearm at a gas station. Three people were arrested that evening, including Angelina Martinez ("Martinez"). On October 5, 2017, a criminal complaint was filed against Graham in the Cleveland Municipal Court alleging assault in violation of Cleveland Codified Ordinances ("C.C.O.") 621.03(a) and unlawful restraint in violation of C.C.O. 621.08(a) in relation to his arrest of Martinez.

{¶ 3} On March 23, 2022, a jury acquitted Graham of unlawful restraint but failed to reach a verdict on the assault charge. The court held a second trial on the assault, and on September 29, 2022, a jury found Graham guilty of this charge. The court sentenced Graham to three years of community-control sanctions and seven days in jail. Graham now appeals raising four assignments of error for our review:

I. Graham's second trial violated his Fifth Amendment protections from double jeopardy and his conviction must be reversed.

II. The city failed to introduce sufficient evidence to sustain the convictions in violation of Graham's right to due process of law as guaranteed by Article I, Section 10 of the Ohio Constitution as well as the Fourteenth Amendment to the United States Constitution.

III. The trial court erred in denying Graham's motions to dismiss on qualified immunity.

IV. Graham's assault conviction is against the manifest weight of the evidence.

{¶ 4} For ease of analysis, we address Graham's assignments of error out of order.

## II. Trial Evidence and Testimony

{¶ 5} At Graham's September 27, 2022 trial, which was the second trial on the assault charge, the following evidence and testimony was presented.

### A. Cleveland Police Officer James Bellomy

{¶ 6} James Bellomy ("Off. Bellomy") testified that he is a police officer for the city of Cleveland and he was working on the night of September 12, 2017. Off. Bellomy and his partner responded to a call concerning a fight at a gas station and "there was a gun — there was a firearm mentioned." Off. Bellomy and Graham, who was also present at the scene, detained one of the male suspects, and Off. Bellomy's partner detained a second male. Both males "fit the description" of the person suspected of having a firearm. The male suspects were handcuffed and placed in the back of separate "zone cars." As officers were placing the second male in the back of a police car, "something [was] going on behind" Off. Bellomy near the zone car in which the first suspect was detained.

{¶ 7} According to Off. Bellomy, "there was a female that was * * * standing at the rear window, * * * talking to whoever the male was in the back seat of that zone car." This female was Martinez. Off. Bellomy did not approach Martinez because he was assisting putting the second male suspect in the back of the zone car. Off. Bellomy did, however, advise Martinez to "step back from that zone car." According to Off. Bellomy, "[s]he was real close" and he told her to step back for "officers' safety." Martinez responded by saying, "F*** you." Off. Bellomy testified

that "there were other officers there" while this incident occurred. Asked how many, Off. Bellomy answered, "I believe it was five."

{¶ 8} On cross-examination, Off. Bellomy testified that Martinez was "acting up" at the gas station during the time in question. Martinez "was using foul language and kind of irate, * * * yelling and screaming." Off. Bellomy testified that when he told Martinez to step back from the vehicle, she "cussed" and "gave me the finger" before moving back "maybe a foot, foot or two. I mean, she was still near the vehicle." Off. Bellomy testified that, in determining whether to detain a suspect, that individual's conduct is "allowed to be considered by an officer on-scene * * *." According to Off. Bellomy, officers do not want individuals approaching detainees in the back of zone cars. "[I]t could be anything from trying to get the person out, to help them get out the back of the car, to provide the person in the back with either contraband or a weapon." Off. Bellomy further testified that it was "common" for individuals to attempt to hide or dispose of firearms before law enforcement found any weapons.

{¶ 9} Off. Bellomy testified that he and his partner arrived at the same time that Graham arrived at the scene, and they were responding to a "priority 1" call, which is the "most serious. Those are the shootings and * * * shots fired." According to Off. Bellomy, the police "approach priority 1's" differently than less serious calls because they "are more stressful. [T]here's usually a weapon or some sort of violence that's * * * been committed * * *." Officer Bellomy further testified that the officer

who detains a suspect, including handcuffing them and putting them in the back of a zone car, is responsible for that suspect's safety and well-being.

{¶ 10} Off. Bellomy further testified that at the time Martinez was detained by Graham, the firearm that was reported in the call had not been located. Asked if he was "still looking for a firearm and you have an individual that's approaching the [zone car]" and this individual is "dismissive and resistant from law enforcement's commands, does that cause you concern," Off. Bellomy responded, "It does."

### B. Cleveland Police Officer Darin Gessino

{¶ 11} Darin Gessino ("Off. Gessino") testified that he is a police officer for the city of Cleveland. He and his partner, Officer Dejesus, responded to a "code 1 priority" call on September 12, 2017, at a gas station "for a fight in progress and a possible gun involved as well." Off. Gessino testified that he and his partner were the third zone car to arrive at the scene, which, according to Off. Gessino, was "somewhat chaotic."

{¶ 12} Off. Gessino testified that he was the second police officer to tell Martinez to "[g]et away from the car." Martinez responded by saying, "Hell no" and "What the f***." Off. Gessino was shown his body-camera video from the incident in question, and he testified that Graham told Martinez to "[s]top and relax" and Martinez responded by "continuing to say, 'What the — * * *.'"

{¶ 13} Asked if "it would be inappropriate for a male officer to put his hand near [a female suspect's] breast area," Off. Gessino answered as follows: "It would be inappropriate to do that, uh, unless there was some sort of struggle that, you

know, if someone's moving around a lot, you might not be thinking where your hands are." Off. Gessino testified that Graham initially put Martinez in the "escort" position, meaning that she was placed against, and facing toward, Graham's zone car. According to Off. Gessino, "[W]e can hold someone so that if they were to try to fight or run, then we would be able to react quickly in that situation." However, Martinez "turns herself away from the car and now is facing * * * Graham." Off. Gessino recalled Martinez kicking Graham and stating "hell no" when Graham was attempting to detain her. According to Off. Gessino, it "appeared" that Martinez kicked Graham "at some point in time as [she] is pushed against the zone car and Graham's hand is near her throat * * *."

{¶ 14} Off. Gessino was asked if any "force or restraint" was used against Martinez after she was placed in handcuffs, and Off. Gessino replied, "To my knowledge, no." He further testified as follows about what Graham said after Martinez was on the ground and handcuffed: "I believe I heard him say that she kicked him in the balls and that she was going to be arrested for that."

### C. Angelina Martinez

{¶ 15} Martinez testified that she was "[f]resh out of high school" and had just turned 18 when the incident at issue in this case took place. She went to a Sunoco gas station to "get[] snacks with friends." Martinez's friends "got into a fight with * * * one of the workers and then another co-worker," and then the police arrived. Martinez was "walking back and forth" from the store to the police car to

"check on [her] friends * * *." According to Martinez, Graham "just came over and was very aggressive with me." Martinez testified as follows as to the details:

> Um, he had asked me to step away from a cop car, and I was listening. I did step away from the cop car. I obeyed his order. Uh, he was yelling still, so I said the F word. I said, "F you" to him.
>
> I believe I flipped him off. Um, and I don't think that he liked that; he felt disrespected. So he just came over and put his hand around my throat, I believe in the video. It happened very fast. But he basically grabbed me by my throat. He pinned me to the ground with his knee.
>
> He pulled my hair with his hand. I don't think he intentionally pulled my hair. But when I was choking, it just happened. Sorry. After being very violent with me, he charged me with assault on an officer and put me in a cop car and sent me to jail.

{¶ 16} Martinez clarified that the police had to tell her "more than once to step away from the cop car" and that Graham engaged with her after she "listened to the order * * *." The prosecutor played Off. Gessino's body-camera video for the jury during Martinez's testimony and asked her to describe what occurred. According to Martinez, she "instantly" stepped away from the zone car after the officers ordered her to step back, "but [Graham] was already walking towards" her.

> He said he was arresting me for assault on an officer, but he started arresting me before our bodies came in contact. So obviously I was reactive. I was freaking out because I knew what he was doing was wrong. I knew he wasn't allowed to grab me like that. I knew a cop wasn't allowed to manhandle me like that. * * * He grabbed me by my throat and he pinned me against the cop car.

{¶ 17} Asked if Graham touched her anywhere else after "his hands were on your throat," Martinez replied, "I don't recall. I just — I know his knee was in my back when I was on the ground. I had trouble breathing." Asked what was "going through her mind" when Graham "threw you to the ground," Martinez replied as

follows: "I don't know. I'm 90 pounds. * * * He could have killed me. I'm sure I overreacted but it felt justified at the time because I was scared."

{¶ 18} Martinez testified that she took pictures of the bruises she had on her neck that night. Martinez identified three photographs depicting "minor bruising on the side [of her throat] where [Graham's] fingers dug in." These pictures, which show bruises on the left, right, and center of her throat, were introduced into evidence at the trial. Martinez further testified that there was no bruising on her throat "before [Graham] touched" her. Asked how long the bruises lasted, Martinez testified as follows: "A couple weeks. The marks, the dark bruises lasted for about a week or two and then there were like red marks, you know, just normal bruises."

{¶ 19} On cross-examination, Martinez testified about bruising on her wrist, which she also took photographs of on the night in question. According to Martinez, while she was in the back of the police cruiser after being arrested, she "jumped" her handcuffs and injured her wrist. Graham's defense attorney explained that "jumping" the handcuffs is when you "take your cuffs from underneath the back of your legs under your feet and pull your wrists in front * * *," and Martinez agreed that this is what she did.

{¶ 20} Martinez asserted on cross-examination that she did not resist being arrested, claiming that "I didn't know I was being arrested" and that Graham "didn't tell me I was being arrested until I was on the ground and his knee was in my back." She further claimed that she did not recall whether Graham spun her around after initially having her up against the police car, or whether she did that on her own.

## D. Cleveland Police Officer Juan Dejesus

{¶ 21} Juan Dejesus ("Det. Dejesus") testified that he is a detective for the City of Cleveland, Division of Police, and was working as a patrol officer on September 12, 2017, when he responded to the call at the gas station in question in this case. Det. Dejesus was Off. Gessino's partner at the time. Asked what the call concerned, Det. Dejesus answered, "I know it involved a gun." When Det. Dejesus arrived, two males had already been apprehended and were being put in the back of zone cars. Det. Dejesus heard another officer say, "Get away from the vehicle," and he turned around to see Martinez standing by one of the cars with a male "detained in the back seat." According to Det. Dejesus, there were "a lot of people [there], so it was kind of hectic." He was "focused [on] if there is a gun, did we find the gun, where was it at * * *." Det. Dejesus's sergeant told him to "go get" Martinez.

{¶ 22} Det. Dejesus's body-camera video was played for the jury. He testified that, at one point, Graham's hands were on Martinez's neck. Det. Dejesus put his arm on Martinez's arm "to assist detaining her." Det. Dejesus let go of Martinez when Graham "was taking her down," because he "didn't want to * * * pull her one way [while] she was getting taken down." Det. Dejesus explained as follows: "I felt due to her stature I didn't have to hold her because she was already getting taken down. When I let her go, she was getting already taken down." Det. Dejesus testified that Graham had "the angle" to take Martinez down, but if he "had the right" angle, he would have "taken her down."

{¶ 23} The following colloquy took place during Det. Dejesus's direct-examination regarding "levels that [officers] have to walk through and the type of force [officers] are allowed to use based on" the general police order from the Cleveland Division of Police (the "GPO") which establishes the "Use of Force" policy:[1]

Q: Uh, and what is the first one?

A: Force level A is [officers] shall first attempt verbal persuasion tactics and warnings to gain the person's cooperation.

Q: Okay. Let me stop you there.

[A portion of Det. Dejesus's body-camera video was played for the jury. An officer can be heard off camera telling Martinez to "get away from the car." Two officers walk toward Martinez, yelling, "Hey! Hey!" Martinez backs two steps away from the police car as the officers approach her.]

Q: Uh, would that be [an] example of verbal tactics, sir?

A: Yes.

Q: Okay, uh, turning your attention back to [the GPO], can you read us the next line or the next step?

A: "If, uh, verbal persuasion and warning do not gain compliance, [officers] shall obtain assistance to gain the person's cooperation through a show of force."

Q: Uh, what does show of force mean, officer?

A: Uh, it can mean a couple different things. It's, you know, officers' presence. The officers' there as a show of presence. That's a show of force, uh, or physical force, detaining somebody.

---

[1] The GPO was introduced into evidence as the City's exhibit No. 11. The contents of the GPO are more fully addressed in the next section of this opinion.

Q: Okay. Uh, and in this instance after the verbal commands, so we have compliance?

A: Uh, it appears so, yes.

Q: Okay. But we still continue on the progression, correct, in terms of force used?

A: Uh, yes.

Q: Uh, can you read the next line in what the next step is in terms of force usage.

A: "If a show of force does not gain compliance the [officers] shall use physical holds."

Q: So physical hold is actually the third step, correct?

A: Right.

Q: And in this instance you actually had compliance after the first step, correct?

A: It appears so, yes.

Q: So there was no need to proceed to step 2 or step 3, correct?

A: Correct.

{¶ 24} Det. Dejesus testified that, pursuant to the GPO, officers shall consider "alternative tactics to the use of force," including allowing "time or opportunity for a person to regain self-control or cease struggling * * *." In applying this policy to the situation at hand, Det. Dejesus testified that Graham allowed Martinez "less than a minute" or "maybe 30 seconds" to "stop resisting."

{¶ 25} Det. Dejesus further testified that, pursuant to the GPO, officers shall consider various factors when choosing how to respond to a situation. Pertinent to this appeal, Det. Dejesus testified that Martinez was "small in stature" and he is

"bigger in stature." Det. Dejesus further testified as follows: "I'm 210 pounds. I realized she was small. And if I held her, I could have, you know, harmed her."

{¶ 26} On cross-examination, Det. Dejesus testified that he and his partner arrived on the scene "significantly later" than Graham and, when this happens, he would typically rely on information he received that the earlier officer "may know * * * to make decisions if they have more information than" he does. Asked if Graham "had significantly more knowledge of what was happening on the scene before you arrived," Det. Dejesus answered, "That's correct." Det. Dejesus further testified that he was responding to a call involving a firearm, which is the "highest priority" type of call.

{¶ 27} Det. Dejesus agreed with defense counsel when asked if the Use of Force Policy should not be "looked [at] in a vacuum." According to Det. Dejesus, "there's other things that can be taken into consideration if the detention is appropriate based on the procedures and the policy * * * at that time." Det. Dejesus also agreed that, when he was ordered to assist Graham in Martinez's detention, he did not have any "intel." Det. Dejesus testified that, because Graham arrested the male suspect with whom Martinez was trying to talk, Graham was "responsible" for this suspect. According to Det. Dejesus, when the police are "in a situation involving a firearm," they "don't want individuals getting close to the police car where someone's detained." Det. Dejesus testified that evidence could be "passed over. [S]omebody could open the door, * * * situations like that." According to Det. Dejesus, this is a "safety concern" and an "evidence compromising concern."

{¶ 28} Det. Dejesus testified that when Martinez was asked to move away from the police car the first time, she "gave the gesture" and "cussed" at the officers. According to Det. Dejesus, when Martinez did back away from the police car, she moved a "[c]ouple feet." In Det. Dejesus's opinion, as a "reasonable officer," this is not a "safe distance" away from a zone car. Det. Dejesus testified that Graham placed his hands on Martinez's "neck region" after Martinez "spun around, * * * indicating to law enforcement that she was not going to allow herself to be cuffed * * *." Asked if her "turbulent behavior" continued, Det. Dejesus answered, "That's correct." Det. Dejesus testified that he did not know what happened with Martinez after Graham detained her because he was still looking for the firearm that was reportedly seen during the fight, which at that point in time, had not been located.

{¶ 29} Asked if Martinez's behavior was cooperative or resistant, Det. Dejesus answered, "Resistant." The detective further testified that if somebody is "resistant," an officer might inadvertently touch that person. Defense counsel asked Det. Dejesus if, but for Martinez's conduct, Graham was "engaging her physically within policy." Det. Dejesus replied, "Yes."

### E. General Police Order

{¶ 30} As testified to by Det. Dejesus, the GPO establishes the City's "Use of Force" policy. In general, the GPO states that police officers "shall use only the force that is objectively reasonable to effectively bring an incident under control, while protecting the life of the [officer] or others." The GPO also states that excessive force is strictly prohibited. Furthermore, "[u]se of force decisions are dictated by the

actions of the resistant or combative person, [police] policy, proper tactics, and training." (Emphasis omitted.)

{¶ 31} Force is defined in the GPO as follows: "any physical strike or instrumental contact with a person, or any significant physical contact that restricts movement of a person." Included within the document's examples of force are "[u]se of a[n officer's] body part(s) to strike a person"; "[a]ctively holding/pinning a person against the ground or other fixed object"; "[a]ny deliberate force which causes injury to a person or causes a person to fall or collide with an object"; and "[a]ny other less lethal physical action required to control a resistant, combative, or violent person."

{¶ 32} Objectively reasonable force is "that level of force that is appropriate when analyzed from the perspective of a reasonable officer possessing the same information and faced with the same circumstances as the officer who actually used force." Furthermore, "[o]bjective reasonableness is not analyzed with hindsight, but will take into account, where appropriate, the fact that officers must make rapid decisions regarding the amount of force to use in tense, uncertain, and rapidly evolving situations."

{¶ 33} An "Actively Resistant" person is defined as follows: "one who takes an offensive or a physically resistant action. These actions can take the form of * * * the person using active physical resistance to custody * * *."

{¶ 34} The GPO explains the "force level" that officers should use in "police-involved use of force" situations. Pertinent parts of this explanation follow:

Force Level

A. [Officers] shall first attempt verbal persuasion tactics and warnings to gain the person's cooperation. If verbal persuasion and warnings do not gain compliance, [officers] shall obtain assistance to gain the person's cooperation through a show of force. If a show of force does not gain compliance, the [officer] shall use physical holds.

B. [Officers] shall determine the level of force necessary to protect themselves or others, or gain compliance from combative, resistant, or violent persons. [Officers] shall consider alternative tactics to the use of force, which include, but are not limited to:

* * *

5. Judiciously allow time and/or opportunity for a person to regain self-control or cease struggling/resisting, when their actions do not immediately threaten the safety of themselves or others.

(Emphasis omitted.)

### F. Christopher Graham

{¶ 35} Graham testified that he was employed as a Cleveland police officer on September 12, 2017. That night, he was a "sector supervisor" on basic patrol. He responded to a dispatch call about a fight "with a gun" at a gas station on "136th and Lorain." Graham testified that this was a "priority 1" call because of the firearm and that five police officers reported to the scene. Graham arrived at the same time as Off. Bellomy and his partner. Det. Dejesus and Off. Gessino "were the last two-man car that arrived." The officers detained two male suspects who fit the descriptions given over the radio. According to Graham, "the guy with the gun was supposed to be wearing the camo pants." This is the male who he detained and placed in the back of the police car that Martinez later walked up to.

{¶ 36} Graham patted this male down and did not find any firearms. A second male was detained and placed in the back of a separate police car. No firearm was found on this male either. Graham testified that "we only had two of the four players and no guns at this point." Graham began to tell Det. Dejesus and Off. Gessino "what had transpired prior to their arrival," when Off. Bellomy "blurted out, 'Get away from the car'" to Martinez. According to Graham, Det. Dejesus and Off. Gessino then "blurted out, 'Get away from the car.' One, two, three officers had given a command."

{¶ 37} Graham testified that "red flags were going off" concerning Martinez "being right up against the car" in which one of the male suspects was detained, her failure to follow the officers' commands, and the fact that the officers "were still just trying to locate the other missing people that were involved and get the guns that were still floating around * * *." According to Graham, it was "a dangerous issue." Graham testified that "bad things can happen" when an unidentified person has access to a suspect in handcuffs. Graham also testified that Martinez's movement "a foot or two" away from the car did not make him feel safe. Graham made the decision to detain Martinez.

> So I want to detain her, put her in handcuffs, and if she's armed, pat her down, figure out who she is if she's involved in the fight, if she's involved with the gun, if she's involved with the guy in the back seat. All these questions but I don't have answers to them yet. So we were gonna handcuff her and hold on to her until we further figured it out.

{¶ 38} Asked specifically if he intended to cause Martinez harm, Graham testified as follows: "No. Actually, uh, quite the opposite. * * * The fact that my hand

ended up on her neck was just me pushing her back, and it's inadvertent. * * * My target zone is above her breasts, below her chin. * * * When I put her in the escort position to get her over the car where I would have held her against the car and then handcuffed her, when she spun, that's a danger clue."

{¶ 39} On cross-examination, the prosecutor asked Graham what he did after hearing the command to Martinez to get away from the car and seeing Martinez's reaction. Graham answered as follows: "I told either Dejesus or Gessino, whoever was closest to me, * * * 'Cuff her up,' I think [were] the words I used." Graham testified that he did not believe Martinez complied with officers' orders because, although she stepped back, as the officers approached her, she "was still very close to the car."

{¶ 40} Asked about his "physical interactions with" Martinez, Graham testified that he had the "first contact" with Martinez, and he "pin[ned] her against the zone car." Martinez then "spun out of" Graham's hold on her and faced him. According to Graham, "when somebody starts to resist your efforts of law enforcement, it can be a precursor to violence." When Martinez spun around, Graham still had one hand on her right arm. According to Graham, his other hand is pushing Martinez "back on the car." Asked where on her body is his other hand touching Martinez, Graham answered, "Throat and chest." The prosecutor asked Graham if his hand was on Martinez's neck, and Graham responded, "Yes, ma'am."

### G. Body-Camera Videos

{¶ 41} Three police body-camera videos were introduced into evidence at trial. Two of these videos detail what occurred between Graham and Martinez. Martinez was asked to step away from the police vehicle twice before she moved and swore at the officers. Three officers approach Martinez, who is still standing within a couple feet of the police vehicle. Graham holds Martinez's right arm behind her back and pins her against the police car as he attempts to put her in handcuffs. At this time, Martinez is facing the police car with her back to the officers. Martinez appears to spin around to face Graham, attempts to punch him by swinging her left arm, and kicks him. Graham pins her back against the police car by putting his hand on her throat for approximately three seconds. At this point, another officer holds her left arm as Graham takes her to the ground. An officer is heard telling Martinez to "relax." Graham holds her down and the other officer puts her in handcuffs.

## III. Law and Analysis

### A. Double Jeopardy

{¶ 42} In his first assignment of error, Graham argues that his second trial violated his protection against double jeopardy because it required "relitigation of factual issues already resolved by the first" trial when he was acquitted of unlawful restraint. Graham further argues that the alleged double-jeopardy violation "was further exacerbated by the lack of any curative instruction from the court either advising the jury as to the limited purpose for which such evidence could be

considered and/or informing them that the legality of the arrest or detention was not an issue in dispute."

{¶ 43} Graham was acquitted of unlawful restraint in his first trial. The Double Jeopardy Clauses of the United States and Ohio Constitutions protect against "'a second prosecution for the same offense after acquittal,'" among other things. *State v. Mutter*, 150 Ohio St.3d 429, 2017-Ohio-2928, 82 N.E.3d 1141, ¶ 15, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). *See also* Fifth Amendment to the U.S. Constitution (No person shall "be subject for the same offence to be twice put in jeopardy of life or limb * * *.").

{¶ 44} Therefore, under the double jeopardy protection, Graham cannot be retried for unlawful restraint of Martinez concerning her arrest on September 12, 2017. *See Lockhart v. Nelson*, 488 U.S. 33, 38, 109 S.Ct. 285, 102 L.Ed.2d 24 (1978) (Double jeopardy "affords the defendant who obtains a judgment of acquittal at the trial level absolute immunity from further prosecution for the same offense * * *.").

{¶ 45} In the case at hand, Graham was not retried for unlawful restraint. Rather, he was retried for assault after his first trial resulted in a hung jury on the assault charge. We find that being retried for assault did not violate Graham's protection against double jeopardy. *See State v. Plott*, 3d Dist. Seneca No. 13-14-21, 2015-Ohio-932, ¶ 4 ("[D]ouble jeopardy does not preclude a second prosecution for the same offense after a mistrial declared by the trial court based on the fact that the jury could not reach a verdict on any of the charges.").

{¶ 46} Additionally, we find no merit to Graham's argument that his second trial required "relitigation of factual issues already resolved by the first," which amounts to a double-jeopardy violation. *See State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 21 ("The United States Supreme Court has held that the federal double jeopardy provision does not preclude evidence of conduct that was subject to a prior acquittal from being introduced as other-acts evidence in a subsequent trial for a different offense.").

{¶ 47} This "successive prosecutions" argument necessarily contemplates being tried for two separate offenses. A "person may not be subjected to multiple prosecutions when proof of one offense is necessary, as a practical matter, to prove the other, and both contemplated offenses arose out of the same criminal conduct." *State v. Thomas*, 61 Ohio St.2d 254, 261, 400 N.E.2d 897 (1980). The *Thomas* Court also held that "successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved by the first." *Id*. at 260. *See also State v. Liberatore*, 4 Ohio St.3d 13, 445 N.E.2d 1116, 1118 (1983) (Double jeopardy "protects the accused from attempts to relitigate facts underlying a prior acquittal.").

{¶ 48} Pursuant to C.C.O. 621.08(a), unlawful restraint is defined as follows: "[n]o person, without privilege to do so, shall knowingly restrain another of his or her liberty." Pursuant to C.C.O. 621.03(a), assault is defined as follows: "[n]o person shall knowingly cause or attempt to cause physical harm to another."

{¶ 49} The Ohio Supreme Court has applied the test developed by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine whether two offenses are the same for double jeopardy purposes. *State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542, ¶ 18. "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger* at 304. "[W]here the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, * * * double jeopardy bars additional punishment and successive prosecution." *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). "This test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case." *Thomas* at 259.

{¶ 50} A conviction for unlawful restraint requires the prosecution to prove, in part, that the defendant restrained another person's liberty. C.C.O. 621.08(a). Assault, on the other hand, requires the prosecution to prove that the defendant knowingly caused or attempted to cause physical harm to another. C.C.O. 621.03(a). Unlawful restraint does not contain an element of "harm," and assault does not contain an element of "restraint." Upon review, we find that these two offenses survive the *Blockburger* test, because "each * * * requires proof of a fact which the other does not." *Blockburger* at 304. Therefore, double jeopardy does not apply.

**{¶ 51}** We further find that, because there is no double-jeopardy violation, it could not have been "further exacerbated by the lack of any curative instruction from the court * * *." *See State ex rel. Tracy v. Indus. Comm.*, 121 Ohio St.3d 477, 2009-Ohio-1386, 905 N.E.2d 625, ¶ 36 ("An exacerbation, by definition, is a worsening * **.").

**{¶ 52}** Accordingly, Graham's first assignment of error is overruled.

### B. Sufficiency of the Evidence

**{¶ 53}** In his second assignment of error, Graham argues that because Martinez resisted arrest, the state was required to present evidence that he used "excessive or unnecessary force" to obtain an assault conviction against him.

#### 1. Prosecution of Law Enforcement Officers

**{¶ 54}** A "law enforcement officer has a privilege to use reasonable force in the discharge of his official duties." *State v. Bolton*, 2018-Ohio-1551, 111 N.E.3d 545, ¶ 23 (6th Dist.), citing *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 14, 17. *See also Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."); *Tennessee v. Garner*, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 85 L.E.2d 1 (1985) (The question regarding the amount of force used by law enforcement officers is "whether the totality of the circumstances justified a particular sort of search or seizure."). The United States Supreme Court has held that "*all* claims that law enforcement officers have used

excessive force * * * in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard * * *." (Emphasis sic.) *Graham* at 395.

{¶ 55} We note that "[w]hile not new, reported instances of Ohio law enforcement officers prosecuted for their on-duty conduct are at least infrequent." *State v. White*, 2013-Ohio-51, 988 N.E.2d 595, ¶ 54 (6th Dist.), *aff'd* by *White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939. The *White* Court further noted that when a police officer uses excessive, rather than reasonable, force while he or she is on duty, "such conduct has typically resulted in a civil suit * * *." *White* at ¶ 53. "The merits of such claims are determined under the doctrines for evaluating police uses of force that have evolved principally from" *Graham* and *Garner*. *Id.* Courts use this same body of law when police officers are faced with criminal prosecutions. "Given that a police officer is authorized and, indeed, frequently obligated to use force * * * the benchmark of the 'objectively reasonable officer' is not just appropriate for criminal prosecutions, but necessary." *White* at ¶ 57.

{¶ 56} In evaluating whether use of force was objectively reasonable, courts have "identified several contextual considerations," including the following: "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he (or she) is actively resisting arrest or attempting to evade arrest by flight." *Graham* at 396, citing *Garner* at 8-9. The *White* Court stated that "[o]ther relevant considerations may, and often do, exist." *White* at ¶ 69.

These include whether the incident occurred at night, "the suspect's demeanor," the "size and stature of the parties involved," and whether the suspect was "intoxicated and noncompliant." *Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir.2008). Also relevant is whether the suspect is, or appears to be, violent or dangerous, the duration of the confrontation, whether it occurs during a chase or an arrest, the possibility that the suspect may be armed, and the number of suspects with whom the officer must contend. *See, e.g., Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir.2004).

*Id.* Furthermore, the White Court noted that these factors are not meant to be an exhaustive list. "Rather, they are simply examples to assist the trier of fact in assessing the reasonableness of force under particular circumstances." *Id.* at ¶ 68.

### 2. Standard of Review

{¶ 57} "[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). "A challenge to the sufficiency of the evidence supporting a conviction requires the court to determine whether the prosecution has met its burden of production at trial." *State v. Toby*, 8th Dist. Cuyahoga No. 106306, 2018-Ohio-3369, ¶ 19. That is, "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph one of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

### 3. Analysis

{¶ 58} Upon review, we find that Martinez testified that Graham "just came over and put his hand around my throat * * *." She further testified that Graham was "very violent" with her, she "knew" Graham was not "allowed to manhandle [her] like that," and Graham "could have killed" her. Martinez weighed only 90 pounds, significantly less than Graham.

{¶ 59} Det. Dejesus testified about the "levels that [officers] have to walk through and the type of force [officers] are allowed to use" to "gain * * * cooperation [or] compliance" under the GPO. Officers "shall first attempt verbal persuasion tactics and warnings"; second, officers can use "a show of force"; third, officers "shall use physical holds."

{¶ 60} Det. Dejesus testified that, at one point, Graham's hands were on Martinez's neck. He further testified that it "appeared" that there was "compliance" after the "verbal commands," which is the first "step." Asked if "there was no need to proceed to step 2 or step 3," Det. Dejesus answered, "Correct." Furthermore, Graham admitted that his "hand ended up on [Martinez's] neck * * *," and the body-camera video evidence corroborates this testimony.

{¶ 61} To convict Graham for assault pursuant to C.C.O. 621.03(a), the City was required to prove that he "knowingly cause[d] or attempt[ed] to cause physical harm to" Martinez. Additionally, because Graham was a police officer acting in the line of duty on the night in question, the state was also required to show that the

force Graham used against Martinez was not "reasonable" under the totality of the circumstances.

{¶ 62} Upon review, we find that the City presented sufficient evidence to convict Graham of assault. The evidence presented at trial was sufficient, if believed, to establish that he knowingly put his hands around Martinez's throat, which caused visible bruising and, which was not reasonable under the circumstances.

{¶ 63} Accordingly, Graham's second assignment of error is overruled.

### C. Manifest Weight of the Evidence

{¶ 64} In his fourth assignment of error, Graham argues that "multiple inconsistencies and pervasive credibility issues plaguing Martinez's testimony render the trier of fact's decision against the manifest weight of the evidence." Specifically, Graham argues that Martinez's testimony is inconsistent with the police officer's body-camera videos showing that she "failed to comply with the officers' initial commands" and that he "did not immediately grab Martinez by the neck * * *."

{¶ 65} A manifest-weight-of-the-evidence challenge "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins*,

78 Ohio St.3d at 387, 678 N.E.2d 541. Reversing a conviction under a manifest-weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 66} This court has held that "a defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness' testimony are inconsistent or contradictory." *State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 40. Upon review, we find that Martinez's testimony is inconsistent, in certain respects, with the body-camera videos introduced into evidence and testimony from other witnesses. However, we do not find the inconsistencies to be of such significance to warrant reversal.

{¶ 67} First, Martinez testified that she "instantly" "obeyed [Graham's] order" to get away from the police vehicle. Off. Bellomy testified that Martinez "cussed" and "gave [him] the finger" before moving back from the police car, but that "she was still near the vehicle" after she moved back. Off. Gessino testified that Martinez initially responded to the order to step away from the police car by saying, "Hell no" and "What the f***." Off. Gessino further testified that Graham then told Martinez to "[s]top and relax."

{¶ 68} Det. Dejesus testified inconsistently regarding whether Martinez complied with the officers' order to step away from the police car. On direct-examination, he stated that it "appeared" that there was compliance. However, he also testified that in response to the first time the officers told Martinez to move, she

"gave the gesture" and "cussed" at the officers. Det. Dejesus further testified that Martinez ultimately moved a "[c]ouple feet" away from the car, and in his opinion, this is not a "safe distance" away from the zone car.

{¶ 69} Second, Martinez testified that Graham "just came over and put his hand around my throat * * *." However, the videos show that Graham's hands were on Martinez's throat only after she spun around and resisted arrest. This video evidence is corroborated by testimony from Off. Gessino, Det. Dejesus, and Graham.

{¶ 70} Notwithstanding these inconsistencies, upon review, we cannot say that this is an exceptional case in which the evidence weighs heavily against the conviction. Nor can we say that the factfinder lost its way in considering the witnesses' credibility and created such a manifest miscarriage of justice that Graham's conviction must be reversed and a new trial ordered.

{¶ 71} Accordingly, Graham's fourth assignment of error is overruled.

## D. Denial of Motion to Dismiss — Qualified Immunity

{¶ 72} Under his third assignment of error, Graham argues that he is entitled to immunity from the assault charge against him because he was justified, under the Fourth Amendment, in using the amount of force he used against Martinez. Specifically, Graham argues that we "must consider whether every reasonable officer would know that law enforcement cannot engage in the particular conduct being alleged in [this] case."

{¶ 73} In Ohio, political subdivision immunity, which is governed by R.C. Chapter 2744, applies to civil cases for injury or loss to persons or property. *See*

*generally Meekins v. Oberlin*, 8th Dist. Cuyahoga No. 106060, 2018-Ohio-1308, ¶ 21; R.C. 2744.02(B)(5) ("[A] political subdivision is liable for injury, death, or loss to a person or property when *civil* liability is expressly imposed upon the political subdivision by a section of the Revised Code * * *.") (Emphasis added.); R.C. 2744.03(A)(identifying defenses and immunities available to political subdivisions or their employees in a "civil action * * * to recover damages * * *."). However, in the case at hand, Graham asks us to apply political subdivision immunity in the criminal context.

{¶ 74} The Eleventh District Court of Appeals has held that "the issue of under what circumstances a police officer should be given immunity from criminal prosecution is a matter best left to the legislature." *State v. Truckey*, 11th Dist. Ashtabula No. 2017-A-0076, 2019-Ohio-407, ¶ 38. In *White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, at ¶ 41, quoting *White*, 2013-Ohio-51, 988 N.E.2d 595, at ¶ 85, the Ohio Supreme Court declined to address the issue of "immunity from criminal liability," which "'might protect police officers from criminal prosecution for using deadly force'" because the appellant forfeited this claim by failing to raise it in the trial court. We agree with the *Truckey* Court that this issue is best left to the legislature.

{¶ 75} Accordingly, Graham's third assignment of error lacks merit.

{¶ 76} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cleveland Municipal Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MARY EILEEN KILBANE, P.J., and
MARY J. BOYLE, J., CONCUR